## CHARLES F. WINTER v. JOHN SASS.

1. VERDICT; *Conflicting Testimony.* The finding of the jury upon the conflicting evidence as to the facts in this case, will not be disturbed by this court.

2. CONVICT; *Competent Witness in Civil Action.* A convict in the state penitentiary is a competent witness in a civil action or proceeding.

3. EVIDENCE; *Anonymous Letter, When Competent.* In an action brought by S. against W. to recover moneys of the former alleged to have been

stolen by the latter, an anonymous letter, received through the office by S., and admitted to have been written by W., and written in consequence mainly, as the latter stated in his testimony, of his hearing that S. was charging him with the larceny, was admitted in evidence. *Held*, No error, although the letter was principally filled with mere matters of abuse, and contained no direct notice of the charge, and only one expression which seems, and that not clearly, to have any reference to it.

4. ATTORNEY; *Should Confine his Argument to Matters in Evidence.* A counsel in his argument to the jury should confine himself in his statements of fact to the matters in evidence. If he travel outside the case, and assert to be facts matters not in evidence, he is guilty of misconduct for which he may be punished personally.

5. ———— Sometimes also the interests of justice require that the verdict returned in his client's favor shall be set aside on account thereof. But there is no absolute rule to this effect. All that can be safely laid down is, that whenever in the exercise of a sound discretion it appears to the court that the jury may have been influenced as to the verdict by such intrinsic matters, however thoughtlessly and innocently uttered, or that the statements were made by counsel in a conscious and defiant disregard of his duty, then the verdict should be set aside.

*Error from Leavenworth District Court.*

ACTION by *Sass* to recover the amount of certain money alleged to have been stolen by *Winter*, and interest thereon. Trial at the September Term 1876. Verdict and judgment for plaintiff. New trial refused, and *Winter* brings the case here. The principal facts are stated in the opinion, *infra*.

One of the grounds set forth in the motion for a new trial was, that Olmstead, one of the jurors, had declared before the trial that "he was satisfied as to the guilt of *Winter*, and that no evidence would change his mind." As against this ground for a new trial it was shown that when examined upon his *voir dire*, as to his competency as a juror, Olmstead stated that "he had heard the case talked of, and had from outside statements formed an opinion, but that such opinion would not affect his trial of the case, or require evidence to remove it." It was also claimed that the testimony of Thomas Carney, a witness for *Sass*, was incompetent. *Winter* had given testimony tending to show that he had an abundance of property and money—that in 1864 he engaged in selling

groceries in Leavenworth, which was a good business until about 1868 or 1869 — that his profits had been large, enabling him to accumulate money, and build houses, and conduct two stores. Carney's testimony was introduced to show, that "after the fall of Richmond, in April 1865, there was a great decline in groceries, and that such decline had been going on since;" and on a cross-examination the witness stated that "the decline affected retail dealers as well as wholesale merchants, and a man could not make much on a declining market."

*E. Stillings,* for plaintiff in error, contended that the court erred in admitting the testimony of Grebe. Section 319 of the civil code provides that the interest of a witness, or his conviction of a crime, shall not disqualify him, but only go to the credibility of the witness. Does this merely remove the common-law disability of persons who have served out their sentence, or was it intended to be used (as it was used in this case) to allow penitentiary convicts to be escorted to our courts by the warden of the penitentiary to give their evidence under the controlling restraints imposed by such custody? What shall we construe §§ 300 and 301 of the crimes act to mean? Grebe could not have made the most simple contract and been bound by it; and yet it was held by the court that he was capable of assuming the obligations of an oath, and under the restraint under which he was acting could incur all the penalties of perjury. It is true that § 335 of the civil code provides for taking the testimony of persons in prison; but is this to be construed to remove the civil death declared to be the condition of one serving his time in the penitentiary? Can he incur the penalties of perjury while in that penitentiary? It ought not to be, and it seems to me ought not to be so construed. The different sections can all be construed to stand together, by construing the one applicable to persons confined in prisons in the different counties in the state, to apply to such prisoners as are confined in jails, etc. It was certainly not

intended to impart the duty on the warden of the penitentiary to take the convicts to the different courts of his county to give testimony. 1 Bur. Law Dic. 219.

2. A paper claimed to be a letter was offered by Sass and read in evidence over the objection of the defendant. What bearing that paper had on the question as to who committed the robbery, no person has ever yet been able to tell, and yet it was introduced, read to the jury, and made the instrument to obtain a verdict simply by an inflammatory appeal to the jury, which ignored all logical argument and reason. When it was introduced and read, no proof had been made which in any manner connected it with the matter of the robbery, and no evidence was ever introduced to show the least connection; and the only thing which had any bearing to show how it was to be used to prove or disprove the matter in issue was the copious drafts of counsel on his imagination in his closing argument to the jury. Has it come to this, that when a man is accused of robbery, his guilt may be proved by evidence which shows that at some time in his life he used opprobrious expressions toward the party robbed, whether he had cause to use them or not? And yet the court by allowing that paper to be read to the jury as evidence to prove that Winter was guilty of the robbery, has said that such evidence may prove the greatest of crimes.

3. The statements of the counsel to the jury of what a former jury had done on less evidence than that before them, in his closing argument, were wholly unwarranted, and are an abuse of his privilege as counsel, which should always set aside a verdict, and especially in such a case as this. I know it is said that the counsel took it back; but every person knows that in taking it back the sting which had been made is made doubly poisonous. As a question of practice, and for the future high standing which the bar of this state should maintain, I ask of this court that it set its seal of condemnation on such proceedings. I refer the court on this branch of the case to Cent. Law. Jour., Nov. 2, 1877, p. 378; 66 Me.; 41 N. H. 317.

4. The court should have granted a new trial on account of the bias of one of the jurors.

5. The testimony of witness Carney was clearly incompetent. The opinion of a wholesale merchant, given in evidence, to prove what was made or lost by the defendant ten years before the loss of this money, when he knew nothing about the business in which Winter was engaged, or what he was doing, is carrying expert testimony too far.

*H. T. Green,* for defendant in error: Counsel for Winter contends that the court erred in admitting the testimony of Grebe, and then proceeds to point out the several sections of the code, which show that in a civil action the interest of a witness, or his conviction of a crime, shall not disqualify him, but only go to the credibility of the witness. It is not necessary for us to contend that in a criminal action he might be competent. The legislature has fixed the rule in civil actions, and the language of the statute is, we think, too plain to be construed away. And while §§ 300 and 301 of the crimes .act do render Grebe incapable of making a contract, it does not, and never did, follow that persons incapacitated to contract, are excluded from giving testimony, for a large class of persons such as children, and at common law married women, and many others, in this and in other countries, whose contracts were void, have notwithstanding been sworn, and whose testimony has always been received. ( 8 Kas. 608, 117.) But Grebe is called as a witness — brought from the penitentiary by the warden under a habeas corpus *ad testificandum.* Two of the attorneys for Winter had, a short time before the trial, called at the penitentiary. One of these attorneys for Winter was also attorney for Grebe, and was called into Winter's case after the pleadings were settled and after the first trial. These attorneys heard Grebe swear, "I would have made the same statement before my sentence, but Mr. Fitzwilliam said I should not do it"—and no effort is made by such attorney to contradict Grebe. Grebe must have told the truth. If, in the conversa-

-tion between Grebe and that attorney, Winter was not implicated, then the attorneys for Winter would in justice to their client, have informed the jury, under oath, that Winter was not one of the parties talked of when Grebe wanted to tell all about the robbery. We think the court did not err in admitting Grebe's testimony. The evidence of an accomplice is to be received against the accused, and if it is uncorroborated in any material particular it is the duty of the judge to warn the jury that it is unsafe to convict upon such evidence, though they have a legal right to do so. Stephens' Digest of Ev. 139; 1 Ph. Ev. 93, 101; T. E. §§ 887, 891; 2 Russell Crimes, 960. Whatever weight the jury gave to Grebe's testimony, is quite another thing. 15 Kas. 547; 17 Kas. 167.

2. Winter wrote an anonymous letter, without date, to Sass, the authorship of which he had denied; but without allusion to that letter, while on the witness stand, he was given pen and requested to write, which he did, and, after he had written a few words in German which were in the letter, it was shown to him, and the identity of the writing compelled him to admit the authorship. This letter was written by a person who had for years been professing friendship for Sass; had invited him and his aged wife to his house; had returned visits; had used Sass's money when he could borrow it, and now, in his deep affliction Winter writes this letter, which must speak for itself. It was proper to show the malignity of Winter's feelings toward this man of seventy-three years who had lost the earnings of his life. It shows Winter capable of engaging in the meanest of occupations, that of writing anonymous letters, and when on oath in the police court he denied its authorship; but after his handwriting was obtained, admitted it, but said he did not send it, while Sass swears it came through the mail.

3. Plaintiff in error complains of an inflammatory argument made by attorney for Sass in the close. He did object while it was going on, and wants a verdict set aside because thereof; wants the supreme court to review an argument be-

fore a jury. I do not know how to reply to that point in the brief of the plaintiff in error, except to refer to *Fry v. Bennett*, 3 Bosw. (N. Y.) 200, where the plaintiff's counsel was indulging in the denunciation of the defendant on an assumption of facts not proven, to which an objection was interposed, whereupon the court responded, "I will say to the jury whatever is proper to be said at the end of the matter," and thereupon the defendant excepted to the refusal of the court to stop the plaintiff's counsel, and a new trial was refused. In the case at bar, in the argument, counsel stated to the jury, that a former jury had, on less evidence, found a verdict for his client, and so forth. The attorneys for Winter stopped the argument, called the attention of the court to what was said, read an instruction which would be asked, and the court gave the instruction to the jury. After all the interruption, retraction of what was said, and instruction of the court, will a reviewing court presume that the jury disregarded the instruction of the court below? The presumption is, that the sworn officers or jurors have done their duty, and have obeyed the instructions of the court. 1 Cliff. 524.

4. The verdict should not be disturbed because Olmstead was one of the twelve jurors. A new trial will not be granted where a party fails to avail himself of the means of ascertaining whether the juror is impartial or not, or could have challenged him. 34 Conn. 280; 8 Iowa, 477; 5 Ind. 122. In this case the attorney not only knew the juror, but heard him say he had formed an opinion before the jury was impanneled, but failed to avail themselves of the right to challenge him for cause. Their complaint comes too late. Nor was there error in admitting the testimony of Carney.

The opinion of the court was delivered by

BREWER, J.: On the 17th of January 1875, $2,601 were stolen from defendant in error, and this action was brought to recover that sum, and interest, from the plaintiff in error as one of the parties alleged to have committed the larceny.

Two juries upon successive trials found in favor of the plaintiff Sass, and from the judgment rendered upon the last verdict this proceeding in error has been brought.

The first matter to which our attention has been directed by counsel, and upon which special stress has been laid, is, the sufficiency of the testimony to sustain the verdict. We have examined the testimony, which is very voluminous, and do not think the claim of counsel can be sustained. One Grebe, admitting his own participation in the larceny, swears positively that Winter planned it, actually took the money, and subsequently gave him seven hundred dollars as his share of the proceeds. Winter denies this *in toto*. Outside of these two principal witnesses there is a mass of circumstantial testimony, some tending to implicate and some to exculpate Winter. It would be a useless labor to attempt to enumerate all the circumstances. Among them may be noticed, that few knew that Sass had any money, and still fewer (not more than three or four, and among these Winter,) where he kept it; that it was taken by some one who knew where it was kept, for the thief entered the house, went to the bureau-drawer, and took it from under some clothes, without searching or disturbing anything else; that it was taken on Sunday evening, when Sass and his wife were at Winter's, about two blocks off, playing cards; that while so playing Mrs. Winter excused herself to put the children to bed, and Winter went out and was absent about half an hour, and upon his return, and the resumption of the cards, neither Winter nor his wife seemed able to keep any track of the game; that immediately after the larceny was discovered, which was on the return of Sass to his home about 10 o'clock that evening, Winter was notified, and for some days was very officious throwing suspicions on different parties, some of whose houses he induced Sass to have searched, finally suggesting to Sass that Mrs. Sass must have taken it. Again, the thief entered the house through the back door, pressing the door until a screw which held the catch of the bolt gave

<span style="margin-note">1. Verdict, upon conflicting testimony.</span>

way. A short time before, Winter had taken a knife and gone to the back door on pretense of fastening the screws, and had cautioned Sass and his wife about the care they should take of their money. Again: One of the pieces of money stolen was a gold dollar which had been used as a breast-pin, and while the pin was gone the catch to which the pin was fastened still remained. On the search of Winter's house some weeks after a similar gold dollar was seen by one of the policemen. Then there was an anonymous and abusive letter sent by Winter to Sass, and contradictory statements of Winter. All this made a mass of testimony, tending strongly to corroborate the positive testimony of Grebe. We do not mean that none of this testimony was contradicted. Much of it was positively denied by Winter and others, so that after all, the case must have turned upon the credibility of the various witnesses. As written down upon paper, it seems to us that the plaintiff's testimony proved his case, and as the jury found in his favor we suppose they must have believed his witnesses. And we cannot say that they were not warranted in so doing.

A second error alleged is, in admitting the testimony of the witness Grebe. At the time of the trial Grebe was a convict in the penitentiary, serving out his sentence for the larceny of this very money. The statute is clear. Section 319 of the code provides, that, "No person shall be disqualified as a witness in any civil action * * * , or by reason of his conviction of a crime; but such * * * conviction may be shown for the purpose of affecting his credibility." And section 335 provides for the examination of any person confined in prison.

2. Convict, when competent witness.

Another objection is made to the admission of the anonymous letter heretofore noticed. It was admitted to be in Winter's handwriting, and Sass testified that he received it through the mail, and Winter that it was written some six or seven weeks after the larceny. The objection made is as to its relevancy. Prior to the time of writing the letter, as Winter testifies, he had

3. Anonymous letter; evidence.

heard that Sass was charging him with the larceny, and had also sent in a bill for some tailoring which was some ten or twelve dollars too large. Thereupon, and because of these two matters, he wrote the letter. It commences, as translated —

"You old monster of men. As I am so far free from you, so at least you cannot make a double charge against me, so will I recall your black soul."

It continues for several sentences in a similarly abusive strain. Now it seems to us that the ruling of the court must be sustained, and upon this principle, that where a charge is made against a man his reply to that charge is admissible against him in a subsequent action based upon that charge. Suppose Sass, meeting Winter, had personally charged him with the larceny. It would clearly be competent to prove what Winter said in reply, although it were simply a torrent of abuse, and with no direct reference to the charge. So here, Winter testifies that this letter was written partly on account of the excessive bill, but more because he had heard of the charge of larceny made by Sass against him. Instead of going to him personally, he writes him this anonymous letter. And while there is no more direct reference to the charge of the larceny than in the words quoted, it seems to us that the letter was competent as Winter's reply to the charge, and as part of his conduct with reference thereto.

So far as the accusation against the juror is concerned, it is not sustained by the proof.

The testimony of Thomas Carney does not seem to have been of sufficient moment, even if outside the scope of legitimate inquiry, to justify a reversal of the judgment.

The remaining error complained of involves the action of the counsel for the plaintiff in his closing argument to the jury. He stated to the jury that a former jury had, on less evidence, found for the plaintiff, and when the other side objected to this statement he reiterated it, and said that the records of the court disclosed this fact. After this however he stated that he re-

4. Attorney; latitude, in argument to jury.

called the remarks, and wished the jury not to consider the same. And the court at the instance of the defendant gave this instruction:

"The jury have no business to consider the fact what the jury on a former trial of this case did, or the fact that the court set aside the finding of that jury. This case must now be determined on the facts of the case as appear by the evidence here."

Ought the verdict for this irregularity to be set aside? We doubt not that many cases may arise in which the misconduct of counsel, in going outside of the evidence in his argument, may be such as to compel a reversal. No one can doubt the impropriety of such conduct. In doubtful cases it may be that which turns the scale, and determines the verdict. And a court, especially a trial court, should be exceedingly careful to restrain such misconduct, and punish the offender personally, and by setting aside every verdict which it has reason to believe has been affected thereby. But to hold that every such misconduct should be visited by a reversal of the judgment, would be unjustifiable rigor, and ofttimes doing as much or greater wrong than the misconduct itself. Who does not know that in the excitement of an argument there occasionally fall from the lips of counsel statements of matters not in evidence? Familiar with all the facts and history of the case, it is not strange that he sometimes refers to facts not proven. Should the client suffer by loss of his verdict, for every such offense of his counsel? Clearly there would be no justice in that. All that can safely be laid down is, that whenever in the exercise of a sound discretion it appears to the court that the jury may have been influenced as to their verdict by such extrinsic matters, however thoughtlessly or innocently uttered, or that the statements were made by counsel in a conscious and defiant disregard of his duty, then the verdict should be set aside. In this case the trial court overruled the motion to set aside the verdict. Doubtless it appeared to it that there was no intentional

*5. When verdict should be set aside.*

wrong, and that the matter was not of itself sufficient to have influenced the minds of the jury; and with that we concur.

Two juries have passed upon the question of fact, each in the same way; and as it is principally a question of fact, and the weighing of conflicting and contradictory testimony, that conclusion ought to stand unless it is clearly and palpably wrong.

The judgment will be affirmed.

All the Justices concurring.