[No. 9548.   Department Two.   January 15, 1912.]

LAURA SNIDER *et al.*, *Appellants*, v. WASHINGTON WATER POWER COMPANY, *Respondent.*[1]

TRIAL—MISCONDUCT OF ATTORNEY—IMPROPER ARGUMENT. It is improper for counsel in argument to discuss the legal effect of the answer to special interrogatories, or their legal bearing upon the general verdict.

NEW TRIAL—MISCONDUCT OF ATTORNEY—DISCRETION—ABUSE—APPEAL—REVIEW. It is not an abuse of discretion to grant a new trial for misconduct of counsel who misstated the ruling of the supreme court upon similar facts, placed before the jury the finding of the court in such case upon similar facts, improperly discussed the legal

[1]Reported in 120 Pac. 88.

effect of answers to certain findings upon special interrogatories and their legal effect upon the general verdict, where the court had a well founded doubt, from the cumulative effect of these and other indiscretions, whether a fair trial had been had.

SAME. It is not an abuse of discretion to grant a new trial for misconduct of counsel, where instructions to disregard various acts and misconduct complained of did not adequately cover some of the instances, and left one of them wholly unwarranted.

APPEAL—REVIEW—NEW TRIAL—DISCRETION. An order granting a new trial will not be reversed on appeal unless abuse of discretion clearly appears where the order was not made on a misconception of law.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered March 2, 1911, upon granting a new trial, after the verdict of a jury in favor of the plaintiffs, in an action for wrongful death. Affirmed.

*W. H. Plummer,* for appellants.

*Post, Avery & Higgins,* for respondent.

ELLIS, J.—This is an appeal from an order granting a new trial on the ground of misconduct of appellants' counsel.

The appellants, the widow and minor children of Silas Snider, deceased, brought this action to recover for his death, which it is claimed was caused by the negligence of the respondent. The respondent owned and operated Natatorium Park, a place of amusement near the city of Spokane. Among the contrivances for amusement, was a circular swing, operated by electricity. It consisted of a center upright pole, some seventy feet high, with cross-arms located at a point about sixty feet from the ground, extending out horizontally a distance of sixteen or eighteen feet, from the ends of which depended, by means of cables, the baskets or cars in which patrons of the amusement sat while being swung round the center pole by the circular movement of the cross-arms. At night the swing was illuminated by a liberal distribution of electric lights at various points on the apparatus.

The electricity for lighting was carried up the center pole

to certain metallic rings or bands placed about the pole at a point immediately below the cross-arms, and transmitted to the lights on the cross-arms by means of metallic brushes fastened to the cross-arms and making continuous contact with the metallic bands as the cross-arms swung around the pole. There were three of these metallic bands. When charged with electric current, the upper band carried about 116 volts, the lower band the same voltage, while the intermediate band was neutral. A person touching, at the same instant, the middle and lower, or the middle and upper bands, would thus receive a current of about 116 volts. If touching at the same instant the upper and lower bands, he would receive about 232 volts. On the pole was a metallic ladder leading to the point of attachment of the cross-arms.

The deceased was in the employ of the respondent, whether as general foreman of the park or as foreman of carpenters, the evidence is conflicting. It is claimed that he climbed the ladder in the performance of his duty to adjust the cross-arms, and inadvertently coming in contact with the metallic bands while the swing was lighted, received a shock which either killed him or caused him to fall from the ladder a distance of some sixty feet to the ground, causing his death. The negligence complained of is that the metallic bands were wholly uninsulated and unprotected in any manner, and that the deceased had no knowledge and received no warning that they were charged with electric current so as to be dangerous. The absence of insulation was apparently admitted, but there was competent evidence tending to show that deceased had knowledge of this fact, and had warning of the danger from contact with the bands. The jury found for the appellants, and assessed the damages at $22,781. We state the facts thus fully in order that the bearing of the misconduct chiefly complained of may be appreciated.

One of the vital questions in issue was as to whether the deceased touched both or either of the charged bands; and if he did, what would be the effect of such contact? An ex-

pert practical electrician was on the stand, and in answer to hypothetical questions, had testified that a person touching one of the charged bands and the neutral band while standing upon the metallic ladder and receiving about 110 volts would experience only a slight shock and would not be burned. That, if touching both of the charged bands and receiving about 220 volts, he would get more of a shock, but would not be burned. The witness further testified from his own experience that he himself had received a current of 600 volts at one time. That he had, in testing lights, often received as much as 110 volts, and had never experienced ill effects from it. On cross-examination, he was asked if 500 volts is not ordinarily fatal? He answered in the negative, and stated that he had known of many such cases in which no serious results ensued. Counsel for appellant then asked:

Q. Did you ever read the case of *Ohrstrom vs. Tacoma*, decided by the supreme court of Washington here just a short time ago and reported in the 57th Washington at page 122, where that court has held as a matter of law that 500 volts is ordinarily fatal to human life? A. I never knew of that. Q. Never knew anything about that. All right. Mr. Post: Let me see the case. Pass it over. Mr. Plummer: Right there, in so many words. Mr. Post: I didn't ask you to tell me about it. I just asked you to pass me the case, and I will read it myself and see what it says."

After counsel for respondent had an opportunity to examine the authority, he interposed objection, and the following took place:

"Mr. Post: I wish now, if your Honor pleases, to object to the statement made by Mr. Plummer that there was a case in the 57th Washington in which the court, as a matter of law, had held that five hundred volts of electricity was fatal. I except to it because it is not true, and I shall ask your Honor at this time, when you come to charge the jury, to charge the jury it is not true. There was a certain complaint and a certain allegation, and the court did not pass on the question of law at all. Mr. Plummer: It certainly makes the assertion in so many words. Mr. Post: All right. Sub-

mit that to the court and the court will pass upon it in all due time.   Mr. Plummer: The plaintiffs except to the statement of counsel made in the presence of the jury, to the effect that it is not true that the supreme court of this state has in its opinion, in the case suggested, declared that it would take judicial notice of the fact that 500 volts was ordinarily fatal.   I am excepting to the part of Mr. Post's statement where he says it is not true.   The court: Both of your exceptions are in the record.   I will look at this case later."

When the court had prepared his instructions for the jury, they were submitted in chambers to counsel for both sides. Among them was an instruction to disregard the statement by counsel for appellants that the supreme court had held, as a matter of law, that 500 volts of electricity would be fatal. After some discussion, the court announced his intention to so instruct, and counsel for appellants then said that he desired to announce in open court that he had been mistaken when he made the statement complained of, and had then misunderstood the decision.   No response was made to this either by the court or by counsel for respondent.   When court and counsel had returned to the court room, and the court was about to charge the jury, counsel for appellant arose and the following statement and exception were made and taken:

"If the court please, during the testimony when Mr. Ingersall was on the stand, I asked him if the supreme court of this state, in the case of *Ohrstrom v. Tacoma*, had not held as a matter of law, that 500 volts were usually fatal.   The opinion I glanced at hurriedly at that time indicated to my mind that was the holding of the court, but I find that simply held that was the evidence in the case, and I wish to ask the court to instruct the jury to disregard the reference made by myself to that opinion, because it was simply made by myself inadvertently and not to mislead the jury.   Mr. Post: I except to the statement of counsel as misconduct and undertaking to tell the jury what was the evidence in that case."

It is manifest that counsel for appellants thus placed before the jury the statement of an authoritative finding on evidence fully as damaging as the misconduct originally complained

of. The court then gave his instructions, and among them one as follows:

"In this connection, it is my duty to instruct you that you should disregard the reference made by the attorney for the plaintiffs to the case of *Ohrstrom versus Tacoma*, a case from which he read in 57 Washington, at page 121, saying that said case held as a matter of law that 500 volts of electricity is ordinarily fatal to human life. It is my duty to inform you that said case does not so hold as a matter of law."

It will be noted that this instruction did not in any manner refer to or tend to remove any effect the statement of counsel as to the evidence in the *Ohrstrom* case may have had upon the jury.

Special interrogatories were submitted to the jury. One of them with the answer was as follows:

"Question 1. In what capacity was Silas Snider employed at the time of his death, as carpenter foreman or general foreman? Answer. Carpenter foreman."

In his closing argument to the jury counsel for appellants used the following language:

"Mr. Post told you, referring to interrogatory No. 1 that is propounded to you, 'in what capacity was Silas Snider employed at the time of his death, a carpenter foreman or a general foreman,' and you have got to write in there which one, whether he was a carpenter foreman or a general foreman. Mr. Post said it did not make much difference to him what you wrote in there, but that as a matter of fact he did assume the risk. And Mr. Post knows that he is trying to convince you by all the argument he can possibly muster, by all his ingenuity, by all his testimony, he is trying to have you put an answer in there saying that he was general foreman, because he knows it does make a difference in this case. And when that is put in there, he will contend that if he was the general foreman he cannot recover, because he assumed all the risks that there were around him, and that is why he wants it put in that way in order to escape this case on a technicality, that is all there is to it."

Thereupon the following colloquy between counsel and court occurred:

"Mr. Post: I wish to except to the statement of counsel. I take the position, if your Honor please, so as to make myself clear. Mr. Plummer: In my time— Mr. Post: (continuing)—that he has no right to tell the jury what would be the legal effect of an answer to a certain interrogatory, he has no right to discuss that question, and I take the exception to Mr. Plummer's undertaking to tell the jury what effect it would have on the general verdict by an answer to the interrogatory one way or the other. Mr. Plummer: I will put this in, that the statement is made in answer to Mr. Post to the effect that it would not make any difference legally which answer they put in there, a statement he made to this jury in his argument to them. Mr. Post: I except to that statement of counsel. I did not say anything of the kind. I said it was not for them or me to say what effect— Mr. Plummer: Is my time to be deducted from this? Mr. Post: You will have all the time you want, as far as I am concerned. The court: I think, Mr. Plummer, that Mr. Post is right in his request that you should not argue the purpose of those interrogatories. The purpose is to get at what the evidence is. Mr. Plummer: Then I ask the court to instruct the jury that they should not consider what the purpose is. I want to be clean here, to have a clean record if this case goes to the supreme court, and I ask the court to instruct the jury. Mr. Post: I except to that statement to the jury that he wants a clean record, when he gets to the supreme court, and the suggestion that it must go to the supreme court or will go to the supreme court, anything like that, and I except to that as improper, and improper conduct on the part of counsel. The court: Gentlemen of the jury, you heard generally what I said to Mr. Plummer a moment ago. You will disregard any statements made as to the purpose of the interrogatories."

While it is entirely proper in argument to discuss the evidence as bearing upon special interrogatories, and in the same connection as bearing upon the general verdict, and even to emphasize the fact that both special findings and general verdict must accord with the evidence to the end that they may stand together without inconsistency or con-

flict, it is not proper to discuss the legal effect of the answer to special interrogatories or their legal bearing upon the general verdict. To permit such argument would, in many cases, tend to defeat the very purpose of special interrogatories and render their submission worse than useless.

"The objection to the statement in question lay in its strong, if not necessary, implication that, having reached a general verdict in favor of the plaintiff, the jurors should not approach the task of answering interrogatories with ingenuous minds, but that they should do so with the predominant purpose of making such answers as would not be out of accord with a general verdict in favor of the plaintiff." *Southern Indiana R. Co. v. Fine,* 163 Ind. 617, 72 N. E. 589.

True, the court then instructed the jury to disregard counsel's statement as to the effect of the interrogatories; but to the lay mind it is difficult to appreciate the difference between discussion of evidence as bearing upon special questions and discussion as to their effect in law. The instruction failed to make this distinction with clearness.

A number of other instances of prejudicial conduct and argument of a more or less serious nature are pointed out, particularly inflammatory argument of counsel for appellants in his closing address to the jury. We cannot quote and review all of them without unnecessarily extending this opinion. It is probably true that no one of these things would have been sufficient ground for, or would have caused the court to grant a new trial. It is plain, however, from the court's remarks, that as the trial progressed there developed in his mind a well defined, and, we cannot doubt, a well founded fear that their cumulative effect was prejudicial to a fair and orderly trial. The court went to the gist of the matter and voiced the thought naturally suggested to any mind by a perusal of the record when, referring especially to the Ohrstrom incident, he said, "The difficulty with remarks of that kind Mr. Plummer, is that one by one those re-

marks will locate a feeling in the minds of the jury and it is impossible to eradicate that." And again the court said:

"Upon the question of conduct of counsel I also have doubt. As suggested by you, Mr. Plummer, if the conduct complained of had occurred but once or twice during the course of the trial, it must be overlooked because we cannot sometimes help the manifestations of our nature, our dispositions, but both of you know that I frequently warned you during the course of the trial and I think I said at one time that I feared you were both endangering whatever verdict might be returned. I say I am in doubt about it because I don't know just what the right of the trial judge is with reference to a verdict, whether it is right to compel the client to suffer for the acts of the attorney; and if so, how far the punishment of the client may be carried. I do not know what influence the conduct had upon the jury, and you both know it was not only the matters that Mr. Post directed my attention to but there were other matters. One of them that I recall now was the reference to an opinion of our supreme court holding as a matter of law that a certain voltage was death to human life, and of course there were many other things."

It is urged that since the court stated, "I do not know what influence the conduct had upon the jury," therefore, he could not say there was not a fair trial, and hence, it was an abuse of discretion to grant a new trial. In these words, the court merely expressed a truism. Of course, no man can say just what the effect of the misconduct was. For that very reason, the court could not say there had been a fair trial. If it had any effect, it was prejudicial.

As said in *Dillingham v. Scales,* 78 Tex. 205, 14 S. W. 566:

"The remarks of counsel excepted to were not justified or called for by anything legitimately belonging to the case. We cannot say they did not improperly prejudice the jury. We cannot say that they exercised no influence on the jury. If they exercised any, it was an improper one."

The true rule was succinctly stated by Justice Brewer in *Winter v. Sass,* 19 Kan. 556, as follows:

"All that can safely be laid down is, that whenever in the

exercise of a sound discretion it appears to the court that the jury may have been influenced as to their verdict by such extrinsic matters, however thoughtlessly or innocently uttered, or that the statements were made by counsel in a conscious and defiant disregard of his duty, then the verdict should be set aside."

See, also, *Bullard v. Boston & M. R. R.*, 64 N. H. 27, 5 Atl. 838, 10 Am. St. 367; *Huckell v. McCoy*, 38 Kan. 53, 15 Pac. 870; *Jordon v. Wallace*, 67 N. H. 175, 32 Atl. 174; *Martin v. State*, 63 Miss. 505, 56 Am. Rep. 812.

The very purpose of the law in requiring the trial judge to preside at jury trials is to insure, as far as may be, that spirit of fairness, orderly conduct, and observance of law without which the administration of justice would be a farce, to the end that a fair trial may be had. When he cannot say with any degree of certainty in his own mind, whether, on account of the conduct of counsel or for any other reason, that this end has been attained, it becomes his duty to grant a new trial. Such a situation is sufficient to invoke that discretion which the law has wisely reposed in the trial judge. Being himself a factor in the trial, he is better able to observe, and in a measure to feel, the effect of these things upon the minds of the jury than an appellate court can be. It is upon this wholesome principle that this court has said that the trial court has an inherent power to grant a new trial to the end that justice may be attained. *Sylvester v. Olson*, 63 Wash. 285, 115 Pac. 175. We have held by an unbroken line of decisions that a motion for a new trial is necessarily addressed to the sound discretion of the trial court, and when the motion has been granted for insufficiency of evidence the order will not be disturbed unless the evidence is undisputed or the discretion has been clearly, and as said in one case, grossly abused.

"A motion for a new trial is addressed to the sound discretion of the court and will not be interfered with on appeal unless it is manifest that the discretion vested in the court

was grossly abused." *Rotting v. Cleman*, 12 Wash. 615, 41 Pac. 907.

See, also, *Sylvester v. Olson, supra; Best v. Seattle*, 50 Wash. 533, 97 Pac. 772; *Angus v. Wamba*, 50 Wash. 353, 97 Pac. 246; *Faben v. Muir*, 59 Wash. 250, 109 Pac. 798; *Welever v. Advance Shingle Co.*, 34 Wash. 331, 75 Pac. 863; *Hughes v. Dexter Horton & Co.*, 26 Wash. 110, 66 Pac. 109; *Thomas & Co. v. Hillis*, 64 Wash. 288, 116 Pac. 854.

The same rule applies with at least equal force where a new trial is granted on account of misconduct of counsel. Indeed, the reasons for the free exercise of a wide discretion are even more potent in such a case than in case of insufficiency of evidence. In the nature of the thing, there is no other person or body to whose discretion such a question can be addressed in the first instance, while the question of sufficiency of evidence is primarily one for the jury. In reason, therefore, and by analogy to other cases of primary cognizance, the court's discretion should be a real one, and its exercise should not be disturbed except in case of clear abuse. It is a general rule applicable to all cases that an order granting a new trial will not be disturbed in the absence of a clear abuse of discretion unless the record discloses that the order was made because of a misconception of the law applicable to the case. *Latimer v. Black*, 24 Wash. 231, 64 Pac. 176; *Holgate v. Parker*, 18 Wash. 206, 51 Pac. 368; *Walgraf v. Wilkeson Coal & Coke Co.*, 65 Wash. 464, 118 Pac. 343.

It is contended that the instructions of the court to disregard the various acts of misconduct complained of were sufficient to remove any impression they may have made upon the minds of the jurymen, and moreover that in most instances offending counsel retracted. In the two specific instances which we have quoted, however, as we have seen, the court's instructions at the time were not reasonably calculated to have that effect; and in the incident involving the *Ohrstrom* case the retraction of counsel injected a new element

of error, namely, the statement as to what the evidence in that case showed, which was not covered by any instruction. In such a case it is no abuse of discretion to grant a new trial. *Greenfield v. Kennett*, 69 N. H. 419, 45 Atl. 233; *Mainard v. Reider*, 2 Ind. App. 115, 28 N. E. 196; *Florence Cotton & Iron Co. v. Field*, 104 Ala. 471, 16 South. 538; *Tucker v. Henniker*, 41 N. H. 317.

It is also contended that counsel for respondent was not without fault, and that he was guilty of many slurring side remarks directed toward counsel for appellants to which a response in kind was justified. It is true that the statement of facts presents a record of a week of wrangling between counsel which could hardly fail to create an atmosphere of passion and prejudice which ought never to prevail in a court of justice. The things, however, which we have pointed out and which from the court's remarks chiefly influenced him to grant a new trial are aside from these. They tended directly to place improper matter before the jury and to suggest things improper for their consideration.

On the whole record, we cannot say that the trial court abused its discretion. The order granting a new trial is affirmed.

DUNBAR, C. J., MORRIS, CHADWICK, and CROW, JJ., concur.