[No. 32944.   Department One.   July 14, 1955.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS AUGUST
REEDER, *Appellant*.[1]

*Nixon & Hove*, for appellant.

*Charles O. Carroll, Frank Harrington, Alfred J. Bianchi*,
and *Keith M. Callow*, for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment
and sentence after a verdict of guilty on a charge of second
degree murder.   Defendant and his wife, Beulah, were mar-
ried in 1938.   It was his second marriage and her third.   She
had three children by her previous marriages.   Mr. Reeder
supported these children, and they took his name.   He and
his wife operated a resort on Lake Sammamish, and, in ad-
dition, he worked on the night shift at Boeings.

In 1952, Mrs. Reeder started working for Milton Price,
who owned and operated a concrete block plant located

[1] Reported in 285 P. (2d) 884.

about four miles east of the Lake Washington floating bridge. The employer-employee relationship between Price and Mrs. Reeder ripened into an affair and led to domestic discord in the Reeder household. At one time she started a divorce action. She and her husband would separate and then become reconciled. This situation continued for some time. However, Reeder was never able to allay his suspicions. He attempted to follow Price and his wife at various times and would discuss his troubles and suspicions with anyone who would listen to him. He made inquiries toward having them arrested. He tried to employ a "private eye" to obtain evidence of adultery.

On September 26, 1953, while they were living apart, Mrs. Reeder's son, Bob, was in a hospital suffering from a stroke. Mr. and Mrs. Reeder and Bob's wife, Gertrude, visited him at the hospital, and after visiting hours were over they drove to a restaurant in Bellevue, where they had dinner. Mr. Reeder offered to raise the money necessary to pay the hospital expenses, which offer was gratefully accepted. Mrs. Reeder stated that she would spend the night with her daughter-in-law, and Reeder drove them home. He then returned to the restaurant for a cup of coffee before driving back to their resort on Lake Sammamish. As he was driving by the block plant on his way home, he noticed his wife's car (given to her by Price) approaching the plant. There was a small apartment above the boiler room, which Price used as an office and living quarters. Reeder stopped and watched his wife go into the apartment. He then saw Price's truck arrive at the plant.

Reeder went home, changed his clothes, and did some necessary chores around the resort. However, he testified that he could not get the situation out of his mind; that he had thought that he and his wife had become reconciled, and that he then was convinced that she had no idea of reconciliation, so he decided to go back to the plant. He testified that he wanted to obtain evidence of his wife's infidelity in order that he might prosecute her and Price under the adultery statute; that he took his revolver with him because

he had been told that Price had a rifle in the apartment and had threatened to shoot him if he (Price) ever caught Reeder "snooping around."

Reeder testified that he approached the plant unseen and through the window in the door observed Mrs. Reeder sitting on Price's lap; that he could not hear their conversation, so he went below into the boiler room and stood on a table, where he could hear them talk; that the conversation was to the effect that Mrs. Reeder was to make a choice between the two men and also concerned methods of getting the resort property away from him; that some time later Price and Mrs. Reeder went into the bedroom and that he (Reeder) came out of the boiler room and went up the steps and around on the outside to the window of the bedroom; that a blanket had been hung over the window to serve as a shade, but that the window was partially open; that he flashed a light into the room and saw them, in the nude, on a bed, in what he described as a "compromising position"; that as he flashed his light through the window he dropped it, making a noise; that Price sat up and reached for something; that he thought Price was reaching for the rifle, and he then took his gun from his pocket and shot.

Six shots were fired, two of the bullets striking Price in the back and one in the thigh. He died instantly. As he was shooting, Reeder fell through the window into the bedroom. In doing so, he cut a severe gash in his thumb. He then proceeded to hit Mrs. Reeder over the side of the head with the gun, causing painful injuries. When they determined that Price was dead, he called the sheriff's office. Since his thumb was bleeding profusely, he decided to go home and dress it and told Mrs. Reeder to tell the officers that they could find him there. When the officers arrived at the cabin, the lights were all on. They called him, and he let them in, gave them his gun, and made a voluntary statement as to what had transpired.

An information was filed against Reeder, charging him with second degree murder, to which he entered a plea of not guilty. He also entered a special plea of not guilty be-

cause of mental irresponsibility at the time of the commission of the act, but alleged further that he had since regained his sanity. At the trial, he relied on self-defense and temporary insanity as his defenses. The jury returned a verdict of guilty as charged, and defendant appeals. Counsel who represented him during the trial and through the hearing on the motion for new trial are not representing him on appeal.

There are nine assignments of error, but we deem it necessary to consider only one.

As a part of the defense, a number of witnesses testified that defendant's reputation for being a peaceable and law-abiding citizen was good. While defendant was being cross-examined, the deputy prosecutor held in his hand a complaint in a divorce action filed in King county by his first wife, which action was never brought to trial. He asked:

"Q. Now, isn't it a fact, Mr. Reeder, that in this divorce action your wife, Josephine Epps—is that what you said? A. Josephine Epps Taulbee, yes. Q. That she stated that the defendant has struck this plaintiff on numerous occasions, and has threatened her with a gun? A. I never threatened her with a gun."

The trial court allowed this question in view of the insanity plea. However, the court did not permit the divorce complaint to be read and refused to admit it in evidence.

In his closing argument, the deputy prosecutor said:

"He, himself, was married before and divorced by a wife who says he threatened her with a gun in '36. The little man with a gun then, the little man with a gun on September 26, 1953. The little man with a gun out at the resort when the big fellow got in a ruckus with him. There hasn't been any change in this man. He was the same yesterday, today, and he will be tomorrow."

Again, in arguing that defendant had made threats against Price, he said:

"What did these threats mean? Now, it is a statement of intention, isn't it? And if you believe that those threats were made, they are matters of fact for you to take into account in determining whether or not the defendant in-

tended and designed to kill Milton Price. Just so the threat against his first wife who he threatened with a gun is a similar factor or circumstance which you can take into account in determining his intent in this case when he went to the block plant."

Again, in arguing that the defendant was not truthful in his testimony, the deputy prosecutor said:

"Again, on my examination he testified he had never threatened his first wife with a gun. I confronted him with that complaint as to that threat that his first wife swore to. That's twice that he was squarely contradicted by other witnesses, and there are other examples of the same lack of veracity in his testimony."

There is not one word of testimony in the record that the defendant threatened his first wife with a gun. The only testimony concerning that question is that he did not do so. Yet the deputy prosecutor in his closing argument said three different times, in arguing three different points, that he did. We do not believe that these misstatements of fact were made inadvertently. They were made deliberately. Furthermore, reference was made to the divorce complaint when the deputy prosecutor knew that the complaint was not in evidence. He knew that the court did not permit it to be placed in evidence.

We realize that attorneys, in the heat of a trial, are apt to become a little over-enthusiastic in their remembrance of the testimony. However, they have no right to mislead the jury. This is especially true of a prosecutor, who is a quasi-judicial officer whose duty it is to see that a defendant in a criminal prosecution is given a fair trial. In *State v. Carr*, 160 Wash. 83, 294 Pac. 1016, we said:

"The entire record discloses that the deputy prosecutor was over-zealous in his studied attempt to parade before the jury incompetent and irrelevant matters. Vigorous counsel need vigorous discipline, at times, at the hands of the trial court. The prosecuting attorney is a quasi-judicial officer and it is his duty to see that one accused of a public offense is given a fair trial. This court has frequently stated the rule as to what constitutes misconduct on the part of counsel. The following cases are decisive on the question. In *State v.*

*Devlin,* 145 Wash. 44, 258 Pac. 826, the prosecutor put the fact before the jury that the defendant's picture was in the rogue's gallery. The case was reversed. We said:

" 'The question involved is that of a fair and impartial trial. In *State v. Pryor,* 67 Wash. 216, 121 Pac. 56, this court said:

" ' "A fair trial consists not alone in an observation of the naked forms of law, but in a recognition and a just application of its principles."

" 'It is the law of the land, a right vouchsafed by the direct written law of the people of the state. It partakes of the character of fair play which pervades all the activities of the American people, whether in their sports, business, society, religion or the law. In the maintenance of government to the extent it is committed to the courts and lawyers in the administration of the criminal law, it is just as essential that one accused of crime shall have a fair trial as it is that he be tried at all, whether he be guilty or not, has his picture in the rogue's gallery or not. In the *Pryor* case just referred to, it was said that it must be remembered, as stated in *Hurd v. People,* 25 Mich. 404, "that unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained is unjust and dangerous to the whole community." '

"In the case of *State v. Montgomery,* 56 Wash. 443, 105 Pac. 1035, 134 Am. St. 1119, we said:

" 'The safeguards which the wisdom of ages has thrown around persons accused of crime cannot be disregarded, and such officers are reminded that a fearless, impartial discharge of public duty, accompanied by a spirit of fairness toward the accused, is the highest commendation they can hope for. Their devotion to duty is not measured, like the prowess of the savage, by the number of their victims.'

"See, also, the following: *Snider v. Washington Water Power Co.,* 66 Wash. 598, 120 Pac. 88; *Rogers v. Kangley Timber Co.,* 74 Wash. 48, 132 Pac. 731; *State v. Arnold,* 130 Wash. 370, 227 Pac. 505; *State v. Bozovich,* 145 Wash. 227, 259 Pac. 395; and *State v. Heaton,* 149 Wash. 452, 271 Pac. 89."

■ No objections were made to the three statements above quoted. However, the harm had already been done, and it could not have been cured by instructions to disregard the statements so flagrantly made. *State v. Navone,* 186 Wash. 532, 58 P. (2d) 1208. Furthermore, the fact that

counsel failed to object to the statements does not warrant or excuse the misconduct of the prosecutor, who, himself, owed a duty to the accused.

We held in *State v. Harold,* 45 Wn. (2d) 505, 275 P. (2d) 895, that in passing upon a motion for a new trial upon the ground of misconduct of the prosecutor, the trial court has a wide discretion, and its judgment must be accorded great weight. In justice to the experienced trial judge, we point out that, at the hearing on the motion for new trial, the only statement called to his attention by the then counsel for defendant was the first one—"The little man with a gun then, the little man with a gun on September 26, 1953." We feel certain that if all three statements of the deputy prosecutor had been called to the trial judge's attention, he would have concluded, as we do, that such misconduct did prejudice the defendant to the extent that he did not receive a fair trial.

The judgment and sentence is reversed, and the cause is remanded with direction to grant appellant a new trial.

HAMLEY, C. J., DONWORTH, FINLEY, and OTT, JJ., concur.

August 15, 1955. Petition for rehearing denied.