[No. 57003-5. En Banc. September 30, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL MONROE FURMAN, *Appellant*.

442

*Michael Monroe Furman,* pro se, *Robert H. Gombiner, Michael P. Iaria,* and *Nance, Iaria & Gombiner,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Michael B. Savage* and *Pamela B. Loginsky, Deputies,* for respondent.

*Beth M. Andrus* and *Alice Miller* on behalf of Amnesty International, amicus curiae for appellant.

ANDERSEN, C.J. —

Michael Furman appeals his aggravated first degree murder conviction and death sentence. We affirm the conviction, vacate the death sentence, and remand for resentencing.

### FACTS OF CASE

Eighty-five-year-old Ann Presler was brutally murdered in her home on April 27, 1989. A friend found her body the next morning. Detectives spoke with Mrs. Presler's neighbors, several of whom said they had seen Michael Furman walking door to door looking for work the day of the murder. Appellant initially denied visiting Mrs. Presler's house, but eventually admitted that he raped, robbed and murdered her.

According to his confession, appellant entered Mrs. Presler's house when she offered him $10 to wash her windows. When he ran out of glass cleaner, he went into the kitchen and asked Mrs. Presler for more. She suggested he use dish soap. He became angry and punched her in the head three times. She fell to the floor. He covered his hand with a rag, grabbed a coffee pot and hit her with the pot. He went to a bedroom, got a vase, returned, and hit her with the vase until it broke. He then went back to the bedroom, got another vase, returned and hit her with it until it too broke. He then raped her and then looked around the house for money. He found her purse. With his hand covered so he would not leave any fingerprints, he searched the purse and removed $30. He then went back into the bedroom and returned with a heavy crystal vase. He realized she was still alive, and he did not want her to be a witness, so he hit her with the crystal vase until he was certain she was dead. Appellant also mentioned that he smoked marijuana the morning of the murder, and he told police where they would find his marijuana pipe.

After taking appellant's confession, the officers obtained a search warrant for his home. During the search, the officers found the clothing appellant said he had been wearing on the day of the murder. They also found a marijuana pipe. The officers photographed and seized the pipe, which was then placed in the police evidence room. The pipe was later inadvertently lost.

Appellant was arrested on April 30, 1989, 2 months before his 18th birthday. Because of his age, he was initially charged

with the murder in juvenile court. Following a declination hearing, the case was transferred to superior court for appellant's prosecution as an adult. The State then filed a notice of intent to seek the death penalty.

After the charges were filed, appellant contacted the investigating detective several times and made additional incriminating statements. He subsequently moved to suppress those statements as well as the statements he made before the charges were filed. He also moved to dismiss the premeditation element of the aggravated first degree murder charge on the ground that the State's loss of the marijuana pipe denied appellant the opportunity to have it tested. The trial court denied both motions.

Trial began in January of 1990. The only disputed issue at trial was whether appellant premeditated the murder. He testified that he smoked one or two bowls of marijuana and two bowls of marijuana sprinkled with methamphetamine 30 to 45 minutes before going to Mrs. Presler's house. The drugs made him "high", which he described as a condition in which he knows what is going on, but feels different and acts without thinking. To support claims of diminished capacity and intoxication, defense counsel called two expert witnesses: Dr. Lloyd Cripe, a neuropsychologist, and Dr. Lawrence Halpern, a neuropharmacologist. Defense counsel had also arranged for appellant to be examined by a clinical psychologist, Dr. Bruce Olson. Dr. Olson did not testify before the jury, but did prepare a report which was then provided to Drs. Halpern and Cripe. That report contains the detailed description which appellant provided of his sexual history. Dr. Cripe testified that appellant has a severe personality disorder. In Dr. Cripe's opinion, because of this disorder and appellant's drug use, it is very improbable that the murder was a deliberate, reflected action.

Dr. Halpern testified regarding the effect of methamphetamine on the mind and expressed the opinion that appellant's use of methamphetamine made him unable to reflect or deliberate about the mechanics or consequences of his

actions. Dr. Halpern also said appellant probably suffers from Cluver-Busi syndrome, which can cause a person to attempt sex with almost any person or even inanimate objects. According to Dr. Halpern, use of methamphetamine would tend to increase sexuality and decrease impulse control. Over defense counsel's objection, the State asked Dr. Halpern about the sexual history material contained in Dr. Olson's report.

The trial court instructed the jury on diminished capacity, but declined to give appellant's proposed instruction on voluntary intoxication. The jury found appellant guilty of aggravated first degree murder, unanimously agreeing that all five alleged aggravating factors had been proved. Following the penalty phase, the jury found the State had proved there were insufficient mitigating circumstances to merit leniency. Appellant was therefore sentenced to death.

## ISSUES

ISSUE ONE. Did the juvenile court err in declining jurisdiction?

ISSUE TWO. Did loss of the marijuana pipe violate appellant's due process rights?

ISSUE THREE. Did the trial court err in ruling on challenges for cause based on the jurors' views regarding the death penalty?

ISSUE FOUR. Did the trial court err in admitting appellant's statements to the police?

ISSUE FIVE. Did the trial court err in admitting an "in life" photo of the victim?

ISSUE SIX. Did the trial court err in allowing the prosecutor to cross-examine appellant's expert about appellant's sexual history?

ISSUE SEVEN. Did the trial court err in failing to give appellant's proposed instruction on voluntary intoxication?

ISSUE EIGHT. Did prosecutorial misconduct deny appellant a fair trial?

ISSUE NINE. May appellant be executed for a crime he committed while a juvenile?

## DECISION

ISSUE ONE.

CONCLUSION. The juvenile court did not err in declining jurisdiction.

A case filed in juvenile court may be transferred for adult criminal prosecution upon a finding that the declination of juvenile court jurisdiction would be in the best interest of the juvenile or the public. RCW 13.40.110(2). In making this determination, the juvenile court is to consider: (1) the seriousness of the alleged offense and whether the protection of the community requires declination; (2) whether the offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against persons or only property; (4) the prosecutive merit of the complaint; (5) the desirability of trial and disposition of the entire case in one court, where the defendant's alleged accomplices are adults; (6) the sophistication and maturity of the juvenile; (7) the juvenile's criminal history; and (8) the prospects for adequate protection of the public and rehabilitation of the juvenile through services available in the juvenile system.[1] All eight of these factors need not be proven; their purpose is to focus and guide the juvenile court's discretion.[2] The court's decision will be reversed only if there has been an abuse of that discretion.[3]

We find no such abuse. The juvenile court expressly considered each of the eight *Kent* (*Kent v. United States*, 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966)) factors and quite reasonably concluded that trying appellant as an adult would

---

[1]*State v. Holland*, 98 Wn.2d 507, 515, 656 P.2d 1056 (1983) (citing *Kent v. United States*, 383 U.S. 541, 566-67, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966)); *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 960 (1991).

[2]*State v. Toomey*, 38 Wn. App. 831, 833-34, 690 P.2d 1175 (1984), *review denied*, 103 Wn.2d 1012, *cert. denied*, 471 U.S. 1067 (1985); *In re Hernandez*, 15 Wn. App. 205, 548 P.2d 340 (1976); *In re Burtts*, 12 Wn. App. 564, 575, 530 P.2d 709, *review denied*, 85 Wn.2d 1014 (1975).

[3]*In re Harbert*, 85 Wn.2d 719, 538 P.2d 1212 (1975); *Toomey*, 38 Wn. App. at 834.

be in the best interests of the public. Appellant was charged with aggravated murder, the most serious offense which can be committed in this state. In view of appellant's confession, the charge had obvious prosecutorial merit. Perhaps most importantly, the crime occurred less than 2 months before appellant's 18th birthday. If he had been tried as a juvenile, he could have been confined only for the 3 years remaining until his 21st birthday.[4] He could not, therefore, have served even the juvenile standard range penalty for the offense. The services available during that time are clearly inadequate to protect the public.

ISSUE TWO.

CONCLUSION. Loss of the marijuana pipe did not violate appellant's due process rights.

■ Appellant contends that loss of the pipe precluded him from having it tested, which might have shown he used methamphetamine as well as marijuana. He claims the loss of evidence to support his diminished capacity/intoxication defense violated his due process rights under the analysis in *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976) and *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983). As we explained in *State v. Straka*, 116 Wn.2d 859, 883, 810 P.2d 888 (1991), the federal constitutional analysis in those cases is no longer valid in light of the Supreme Court's decisions in *California v. Trombetta*, 467 U.S. 479, 488-89, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). We have not yet decided if the state constitution requires adherence to the analysis in *Vaster* and *Wright*.[5] We will consider whether to apply our state constitutional provisions more strictly than parallel federal provisions only when we are asked to do so,[6] "and even then only if the argument includes proper analy-

[4]RCW 13.40.300(1).

[5]*See State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992).

[6]*State v. Yates*, 111 Wn.2d 793, 799 n.8, 765 P.2d 291 (1988).

sis of the six 'interpretive principles' outlined in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)."[7] Appellant offers no such argument. We therefore confine our analysis to the federal constitution.

█ "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."[8] "To meet this standard of constitutional materiality, evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Citation omitted.)[9] The pipe possessed no apparent exculpatory value when it was lost. Although appellant had mentioned using the pipe to smoke marijuana, he did not claim to have been impaired by that use, nor did he mention methamphetamine use at all. Moreover, his detailed descriptions of the murder indicated no mental impairment.[10]

If evidence did not possess an apparent exculpatory value when it was lost or destroyed, but was nevertheless "potentially useful", failure to preserve that evidence constitutes a violation of due process if "a criminal defendant can show bad faith on the part of the police".[11] Appellant conceded at trial that there is no evidence of bad faith.

---

[7]*State v. Motherwell*, 114 Wn.2d 353, 368, 788 P.2d 1066 (1990); *accord, State v. Worrell*, 111 Wn.2d 537, 539 n.1, 761 P.2d 56 (1988); *State v. Wethered*, 110 Wn.2d 466, 472, 755 P.2d 797 (1988).

[8]*California v. Trombetta*, 467 U.S. 479, 488, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984).

[9]*Trombetta*, 467 U.S. at 489.

[10]Also, in at least one statement to the police, appellant said he used the pipe to smoke marijuana after the murder. Thus, even if the pipe had been tested and shown to contain that drug, it would have proved nothing about appellant's mental state at the time of the offense.

[11]*Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988).

ISSUE THREE.

CONCLUSION. Our vacation of appellant's death sentence moots his argument regarding the trial court's rulings on the challenges for cause.[12]

All of the challenged rulings were based on the jurors' views on the death penalty. Erroneous rulings on challenges for cause related to such views have "no bearing on the validity of [the] conviction."[13]

ISSUE FOUR.

CONCLUSION. The trial court did not err in admitting appellant's statements to the police.

■ In determining the voluntariness of a juvenile's confession, the court must consider the totality of the circumstances, including the juvenile's age, experience, and capacity to understand the warnings given him.[14] According to the trial court's unchallenged findings, appellant was free to leave when he made his first statement.[15] It was not, therefore, necessary to inform him of his constitutional rights at that time.[16] Appellant was informed of his constitutional rights, as required by *Miranda*,[17] following his initial state-

---

[12]Appellant raises several additional issues involving penalty phase evidentiary rulings and jury instructions and the death penalty statute. These issues are also mooted by our vacation of appellant's death sentence.

[13]*Morgan v. Illinois,* ___ U.S. ___, 119 L. Ed. 2d 492, 509 n.11, 112 S. Ct. 2222 (1992). *Accord, Witherspoon v. Illinois,* 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968). *See also Lockhart v. McCree,* 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986) (process of death qualifying jury does not result in conviction-prone panel); *State v. Irizarry,* 111 Wn.2d 591, 596, 763 P.2d 432 (1988) (same).

[14]*Fare v. Michael C.,* 442 U.S. 707, 712-13, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *Dutil v. State,* 93 Wn.2d 84, 87, 606 P.2d 269 (1980).

[15]All of the trial court's CrR 3.5(c) findings of fact are unchallenged and therefore verities on appeal. *State v. Christian,* 95 Wn.2d 655, 656, 628 P.2d 806 (1981).

[16]*Beckwith v. United States,* 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976) (*Miranda* warnings required if suspect is taken into custody or deprived of his freedom of action in any significant way).

[17]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

ment and before he made any additional incriminating statements. Appellant at no point asserted his Fifth Amendment right to counsel.[18] Nor did he assert his right to remain silent.[19] Some of appellant's statements were made after the information was filed, and thus after his right to counsel attached under the Sixth Amendment and Const. art. 1, § 22 (amend. 10).[20] The detectives repeatedly advised appellant of that right, however, as did his attorney. Against the advice of counsel, appellant repeatedly contacted the detectives and made additional incriminating statements. This evidence clearly supports the trial court's finding that the statements were voluntary.[21]

 Appellant contends that his confessions are involuntary, however, because the detective falsely told him that police had found evidence linking him to the murder and, later, gave him Coca-Cola and food. This contention is without merit. Misleading statements about the strength of the State's evidence do not render an otherwise valid confession involuntary.[22] A confession can be involuntary if the interrogating officers withhold food or water from the suspect, or offer food or water as an inducement to confess.[23] There is no

---

[18]See *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990) (police may not interrogate suspect who has asserted Fifth Amendment right to counsel, unless counsel is present or the suspect initiated the communication).

[19]See *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975); *State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987) (police must scrupulously honor suspect's right to remain silent).

[20]*Kirby v. Illinois*, 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972); *State v. Earls*, 116 Wn.2d 364, 373, 805 P.2d 211 (1991).

[21]*State v. Petitclerc*, 53 Wn. App. 419, 425, 768 P.2d 516 (1989).

[22]*Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969) (false statement that fellow suspect had incriminated defendant insufficient to make otherwise voluntary confession inadmissible); *State v. Braun*, 82 Wn.2d 157, 162, 509 P.2d 742 (1973) (same where officer misstated admissibility of codefendant's confession).

[23]*Brooks v. Florida*, 389 U.S. 413, 19 L. Ed. 2d 643, 88 S. Ct. 541 (1967).

evidence that appellant was ever deprived of food or drink or that either was offered as an inducement to confess. According to the trial court's unchallenged findings of fact, the detective offered appellant food and drink as an act of courtesy.

ISSUE FIVE.

CONCLUSION. The trial court did not err in admitting an "in life" picture of the victim.

██ "In life" pictures are not inherently prejudicial, particularly where as here the jury has seen "after death" pictures of the victim's body.[24] The trial court's ruling admitting such a photograph will not be reversed absent a showing of a manifest abuse of discretion.[25] We find no such abuse here. The trial court did not allow the State to present the in-life picture until it could be tied to some issue other than simply the victim's identity, which was not challenged. The picture was ultimately admitted to identify the broken eyeglasses which were found in the victim's sink after her death, and which she was wearing in the picture. The trial court reasonably concluded that the picture's relevance for that purpose outweighed any possible prejudicial effect.[26]

ISSUE SIX.

CONCLUSION. The trial court did not commit reversible error in allowing the prosecutor to cross-examine Dr. Halpern about appellant's sexual history.

██ The sexual history information had been provided by appellant himself to Dr. Olson, who prepared a report which was then given to Dr. Halpern to assist him in reaching the conclusions he presented at trial. Dr. Halpern testified that he read the report and relied on the sexual history, at least to some extent, in reaching some of his conclusions. An expert may be required to disclose the facts or data underlying his opinions. ER 705. Otherwise inadmissible evidence

---

[24]*State v. Rice,* 110 Wn.2d 577, 599-600, 757 P.2d 889 (1988), *cert. denied,* 491 U.S. 910 (1989).

[25]*Rice,* 110 Wn.2d at 599-600.

[26]*See Rice,* 110 Wn.2d at 600; ER 403.

may be admissible to explain the expert's opinion or to permit the jury to determine what weight it should be given.[27]

Appellant contends that the evidence should have been excluded under ER 403 because its relevance was outweighed by its prejudicial effect. Appellant understates the relevance of his sexual history. Dr. Halpern testified that appellant's use of methamphetamine increased his sexual drive and diminished his capacity to premeditate the murder. The validity of that conclusion is undermined if appellant committed sexually violent acts before he began using methamphetamine, as his sexual history indicated.

Moreover, we are vacating appellant's death sentence on other grounds, and any possible error in the admission of the sexual history evidence was harmless as to the conviction itself. The erroneous admission of "bad acts" evidence is not of constitutional dimension, and thus requires reversal only if there is a reasonable probability the error affected the verdict.[28] The only disputed issue in the guilt phase was whether appellant premeditated the murder. The clearest evidence on that question was appellant's confession. He described repeatedly leaving the room, getting new weapons, and returning to continue the attack. He also related using cloths to prevent leaving fingerprints. Finally, he said he hit the victim with the crystal vase because she was still alive and he did not want her to be a witness. Particularly in view of this confession, which describes a clearly premeditated murder, committed by a person fully aware of the consequences of his actions, there is no reasonable probability that admission of the sexual history evidence affected the guilt phase verdict.[29]

ISSUE SEVEN.

CONCLUSION. The trial court did not err in failing to give appellant's proposed instruction on voluntary intoxication.

---

[27]*Group Health Coop. of Puget Sound, Inc. v. Department of Rev.*, 106 Wn.2d 391, 400, 722 P.2d 787 (1986).

[28]*State v. Robtoy*, 98 Wn.2d 30, 44, 653 P.2d 284 (1982).

[29]*Robtoy*, 98 Wn.2d at 44.

Appellant offered two substantially overlapping defenses — diminished capacity and voluntary intoxication. Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged.[30] Voluntary intoxication is not a defense, as such, but a factor the jury may consider in determining if the defendant acted with the specific mental state necessary to commit the crime charged.[31] If there is substantial evidence to support either of these theories, the jury should be given instructions which allow the defendant to argue the defense.[32] If the claim of diminished capacity is premised wholly or partly on the defendant's voluntary consumption of drugs or alcohol, however, one instruction can be adequate to permit the defendant to argue defendant's theory of the case. *State v. Hansen*, 46 Wn. App. 292, 730 P.2d 706, 737 P.2d 670 (1987). In *Hansen*, the Court of Appeals held that an instruction on voluntary intoxication was adequate to allow the defendant to argue the claim of diminished capacity based on drug intoxication. In much the same manner, the diminished capacity instruction which appellant's jury received was adequate to permit him to argue that drug use and other factors made him unable to premeditate the murder. The trial court's failure to give a separate instruction on voluntary intoxication did not impair appellant's ability to argue his theory of the case.

ISSUE EIGHT.

CONCLUSION. None of the claimed guilt phase prosecutorial misconduct prejudiced appellant's right to a fair trial, and appellant's challenge to the prosecutor's penalty phase conduct is mooted by our vacation of the death sentence.

---

[30]*State v. Ferrick*, 81 Wn.2d 942, 944, 506 P.2d 860, *cert. denied*, 414 U.S. 1094 (1973); *State v. Edmon*, 28 Wn. App. 98, 103-04, 621 P.2d 1310, *review denied*, 95 Wn.2d 1019 (1981).

[31]RCW 9A.16.090; *State v. Coates*, 107 Wn.2d 882, 735 P.2d 64 (1987).

[32]*State v. Griffin*, 100 Wn.2d 417, 419, 670 P.2d 265 (1983).

■ Appellant bears the burden of establishing both the impropriety of the prosecutor's conduct and its prejudicial effect.[33] Since we are vacating the death sentence, appellant cannot show he was prejudiced by any misconduct which may have occurred during the penalty phase of the case. The vast majority of the claimed acts of misconduct occurred in that phase of the trial. The prosecutor's allegedly improper guilt phase questioning of appellant's expert appears to have been raised only to support appellant's claim of an overall pattern of prosecutorial misconduct.

■ We have reviewed the entire transcript of the questioning of appellant's expert. Both the nature of that questioning and the strength of the State's evidence are quite different than in *State v. Reed*, 102 Wn.2d 140, 684 P.2d 699 (1984), on which appellant relies. The two cases are similar only in that the defendant called expert witnesses to support a claim of diminished capacity. It was undisputed in *Reed* that the defendant was extremely intoxicated when he killed his wife.[34] Here, by contrast, several neighbors who saw appellant shortly before the murder noticed no impairment, and he admitted in his confession that he killed the victim because he did not want her to be a witness. Additionally, the prosecutor in *Reed* asked the jury not to believe the defense experts because they were "city doctors" from outside the community.[35] That clearly improper argument cannot realistically be compared to the prosecutor's cross examination here. The prosecutor was not suggesting the jury should disbelieve appellant's expert because of who he was or where he came from, but because his opinions were not credible. A prosecutor has wide latitude in drawing and

---

[33]*State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991); *State v. Hughes*, 106 Wn.2d 176, 195, 721 P.2d 902 (1986); *State v. Mak*, 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

[34]*State v. Reed*, 102 Wn.2d 140, 142, 684 P.2d 699 (1984).

[35]*Reed*, 102 Wn.2d at 143.

expressing reasonable inferences from the evidence.[36] While the manner in which the prosecutor expressed those inferences here cannot be commended, the inferences themselves were not improper. Nor is the manner in which they were drawn so prejudicial as to affect the verdict or deprive appellant of a fair trial.[37]

ISSUE NINE.

CONCLUSION. Neither the declination statute nor the death penalty statute authorizes imposition of the death penalty for crimes committed by juveniles.

The United States Supreme Court has upheld imposition of the death penalty against defendants who were 16 or 17 when their crimes occurred. *Stanford v. Kentucky*, 492 U.S. 361, 106 L. Ed. 2d 306, 109 S. Ct. 2969 (1989). The issue in *Stanford* was not whether a state statute authorized that penalty, however. Kentucky and Missouri state courts had applied their state statutes in that manner and had upheld the defendants' death sentences. The issue before the Supreme Court was whether application of those statutes in that manner violated the Eighth Amendment. Before any constitutional issue is raised here, we must first conclude that Washington statutes authorize imposition of appellant's death sentence.[38]

The "trial court's sentencing authority is limited to that expressly found in the statutes."[39] Our criminal laws apply to children as young as 8 years old. RCW 9A.04.050; *State v. Q.D.*, 102 Wn.2d 19, 685 P.2d 557 (1984). The juve-

---

[36]*Hoffman*, 116 Wn.2d at 94-95.

[37]*Hughes*, 106 Wn.2d at 195 (defendant must show there is a substantial likelihood the misconduct affected the verdict thereby depriving defendant of a fair trial) (quoting *Mak*, 105 Wn.2d at 726).

[38]*State v. Tingdale*, 117 Wn.2d 595, 599, 817 P.2d 850 (1991); *State v. Maxwell*, 114 Wn.2d 761, 771, 791 P.2d 223 (1990); *State v. Ng*, 110 Wn.2d 32, 36-37, 750 P.2d 632 (1988) (constitutional issues should not be reached unless absolutely necessary).

[39]*State v. Theroff*, 33 Wn. App. 741, 744, 657 P.2d 800, *review denied*, 99 Wn.2d 1015 (1983). *Accord, In re Carle*, 93 Wn.2d 31, 33, 604 P.2d 1293 (1980).

nile court may decline jurisdiction and transfer any case for prosecution to adult court, if the appropriate legal criteria are satisfied, regardless of the age of the juvenile. RCW 13.40.110(2). The penalty for aggravated murder, in cases prosecuted in adult court, is either death or life imprisonment without the possibility of release or parole. RCW 10.95.080. Thus, if these statutes authorize imposition of all adult penalties against juveniles transferred to adult court, a child as young as 8 could theoretically be tried as an adult and sentenced to death or life without parole for aggravated murder. One youth has in fact been convicted of that offense and sentenced to life in prison without parole for a crime he committed at age 13.[40] If the State there had sought the death penalty, RCW 10.95.070(7) would have allowed the jury to consider the defendant's youth as a mitigating factor, but the death penalty statute does not require the jury to treat any mitigating factor alone as sufficient to merit leniency.[41]

Admittedly, it is unlikely the State would seek, or the jury would return, a death sentence against an extremely young defendant. The significant factor, however, is that such verdicts would be *possible* if our statutes were interpreted to authorize imposition of the death penalty for crimes committed by juveniles. The 4-justice plurality in *Thompson v. Oklahoma*, 487 U.S. 815, 101 L. Ed. 2d 702, 108 S. Ct. 2687 (1988) concluded that the death penalty cannot be imposed against defendants who were 15 or younger when the crime occurred because the death penalty serves no valid retributive or deterrent purpose in such cases. In her concurrence, Justice O'Connor concluded, more narrowly, that defendants under 16 when their crimes were committed "may not be executed under the authority of a capital punishment statute that specifies no minimum age at which the commission of a

---

[40]*State v. Massey*, 60 Wn. App. 131, 803 P.2d 340, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 960 (1991).

[41]*See* RCW 10.95.060(4).

capital crime can lead to the offender's execution."[42] Under either view, our statutes would clearly be unconstitutional as applied to defendants 15 or younger if interpreted to authorize imposition of the death penalty following decline of jurisdiction in juvenile court. RCW 13.40.110 authorizes juveniles to be tried as adults, but does not mention the death penalty. RCW 10.95 authorizes imposition of the death penalty, but does not refer to crimes committed by juveniles. Most critically, neither statute sets any minimum age for imposition of the death penalty.

" '[W]herever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality.' "[43] We cannot rewrite the juvenile court statute or the death penalty statute to expressly preclude imposition of the death penalty for crimes committed by persons who are under age 16 and thus exempt from the death penalty under *Thompson*.[44] Nor is there any provision in either statute that could be severed in order to achieve that result. The statutes therefore cannot be construed to authorize imposition of the death penalty for crimes committed by juveniles. Absent such authorization, appellant's death sentence cannot stand.[45]

Appellant's aggravated first degree murder conviction is affirmed. The death sentence is vacated, and the case is remanded for imposition of a sentence of life in prison without the possibility of release or parole.

BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

---

[42]*Thompson v. Oklahoma*, 487 U.S. at 857-58.

[43]*World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 392, 816 P.2d 18 (1991) (quoting *State v. Browet, Inc.*, 103 Wn.2d 215, 219, 691 P.2d 571 (1984)), *cert. denied*, 112 S. Ct. 1672 (1992).

[44]*Addleman v. Board of Prison Terms & Paroles*, 107 Wn.2d 503, 509, 730 P.2d 1327 (1986) (court may not "read into a statute those things which it conceives the Legislature may have left out unintentionally").

[45]*Carle*, 93 Wn.2d at 33; *Theroff*, 33 Wn. App. at 744.

UTTER, J. (concurring) — I concur in the majority's holding that there exists no authority under the statute to execute juveniles. I would go further and hold that, in comparison to other cases as mandated by RCW 10.95.130, the penalty of death is excessive or disproportionate to that of other juveniles convicted of aggravated first degree murder.

First, juveniles in our state receive different treatment than adults across a broad range of legal categories. It is, in my view, wholly inappropriate to suspend this treatment for the purpose of imposing the most severe penalty available under our criminal system. Second, there is no evidence of community standards in our state to support the execution of a person who was a juvenile at the time of the offense. Finally, I believe Washington should join the emerging national trend of legislatures recognizing that it is improper to execute persons who were juveniles at the time the crime was committed. I write also to indicate that the prosecutor's misconduct in this case was egregious and would constitute an independent ground for reversing Furman's sentence even if we were not invalidating his sentence of death on another ground.

I

THE STATUS OF MINORS UNDER WASHINGTON LAW

Juveniles in Washington receive different, indeed protective, treatment as compared to adults across a wide range of legal categories. The State restricts a minor's right to vote, to serve on a jury, to marry without parental consent, even to purchase alcohol and cigarettes. *See, e.g.*, RCW 26.28-.015(3) and article 6, section 1 of the Washington State Constitution (restricting a juvenile's right to vote); RCW 2.36-.070 (restricting a juvenile's right to serve on a jury); RCW 26.04.210 and RCW 26.28.015(1) (restricting a juvenile's right to marry); RCW 26.28.080(1) (restricting a juvenile's right to be present in places were intoxicating liquors are sold); RCW 26.28.080(4) (restricting a juvenile's right to purchase or possess tobacco products); RCW 26.28.070 (restricting a juvenile's right to certain types of employment); RCW

26.28.080(2) (restricting a juvenile's right to be present in a public pool or billiard hall); RCW 26.28.080(3) (restricting a juvenile's right to gamble or be present in houses of prostitution or drug use); RCW 26.28.080(5) (restricting a juvenile's right to purchase or possess a handgun); RCW 9.68 (restricting a juvenile's right to purchase or possess sexually explicit materials).

These laws reflect a recognition by courts and commentators alike that minors have less in the way of developed and responsible decision-making faculties than adults. *See, e.g., Parham v. J.R.*, 442 U.S. 584, 603, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979) ("[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions"); *Bellotti v. Baird*, 443 U.S. 622, 635, 61 L. Ed. 2d 797, 99 S. Ct. 3035 (1979) ("during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them"); *Ginsberg v. New York*, 390 U.S. 629, 649-50, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968) (Stewart, J., concurring) ("a child . . . is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees") (citation omitted); *see also Carey v. Population Servs., Int'l*, 431 U.S. 678, 693 n.15, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1977) ("the law has generally regarded minors as having a lesser capability for making important decisions"). *See generally* Streib, *The Eighth Amendment and Capital Punishment of Juveniles*, 34 Clev. St. L. Rev. 363 (1985-1986); Comment, *Capital Punishment for Minors: An Eighth Amendment Analysis*, 74 J. Crim. & Criminology 1471 (1983); Note, *The Decency of Capital Punishment for Minors: Contemporary Standards and the Dignity of Juveniles*, 61 Ind. L.J. 757 (1986).

It is not only anomalous, but in my view grossly inappropriate, to create an exception to our otherwise protective treatment of minors for the purpose of considering whether their acts should be punishable by death.

Moreover, I think it time Washington joined the state legislatures recognizing the impropriety of executing persons

for crimes committed as juveniles. In the past several years at least five states have examined this issue, and have excluded the imposition of the death penalty for juvenile crime: New Jersey (N.J. Stat. Ann. § 2C:11-3(g) (West Supp. 1993), § 2 A:4A-22(a) (West 1987 & Supp. 1993)); Oregon (Or. Rev. Stat. §§ 161.620, 419.476(1) (1991)); Colorado (Colo. Rev. Stat. § 16-11-103(1)(a) (1986 & Supp. 1992)); Nebraska (Neb. Rev. Stat. § 28-105.01 (1989)); and Ohio (Ohio Rev. Code Ann. § 2929.02(A) (Anderson 1993)). *See* Note, *The Juvenile Death Penalty: Counsel's Role in the Development of a Mitigation Defense*, 53 Brook. L. Rev. 767, 776 n.78 (1987-1988).

## II
### PROPORTIONALITY

I have already explained at length my reservations about proportionality analysis under our statute. *State v. Campbell*, 103 Wn.2d 1, 41-49, 691 P.2d 929 (1984) (Utter, J., concurring in part, dissenting in part), *cert. denied*, 471 U.S. 1094 (1985); *State v. Jeffries*, 105 Wn.2d 398, 431-40, 717 P.2d 722 (Utter, J., dissenting) (*Jeffries* I), *cert. denied*, 479 U.S. 922 (1986); *State v. Harris*, 106 Wn.2d 784, 802-06, 725 P.2d 975 (1986) (Utter, J., dissenting), *cert. denied*, 480 U.S. 940 (1987); *State v. Lord*, 117 Wn.2d 829, 939-45, 822 P.2d 177 (1991) (Utter, J., dissenting), *cert. denied*, 113 S. Ct. 164 (1992); *State v. Benn*, 120 Wn.2d 631, 697-709, 845 P.2d 289 (1993) (Utter, J., dissenting). I shall not repeat them here, other than to note there are serious problems in the statutory design and serious methodological flaws in the manner in which we have structured our review.

Putting these reservations aside, RCW 10.95.130 requires us to evaluate whether the sentence of death is excessive or disproportionate as compared to other similar cases. We should therefore consider similar cases in which the defendant was found guilty of aggravated first degree murder, whether or not the death penalty was actually imposed or carried out. RCW 10.95.130(2)(b). As I have emphasized elsewhere, the relevant inquiry is whether the death penalty is *generally* imposed in similar cases, not whether it has *ever*

been imposed in such cases. *See State v. Lord*, 117 Wn.2d at 940 (Utter, J., dissenting); *In re Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990) (*Jeffries* II).

To make this determination, we must compare the facts and circumstances of Furman's crime with those of others who have committed aggravated first degree murder while still juveniles. This involves taking into account the presence or absence of aggravating factors. *See Lord*, 117 Wn.2d at 940 (citing *Jeffries* II, 114 Wn.2d at 490). Yet we must do more than compare numbers of victims or aggravating circumstances. We must engage in a "careful examination of the circumstances of the crimes and the defendants' personal characteristics." *Jeffries* II, 114 Wn.2d at 490 (citing *State v. Rupe*, 108 Wn.2d 734, 768-70, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988)); *State v. Rice*, 110 Wn.2d 577, 625-28, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

An examination of similar crimes committed by juveniles reveals clearly that visiting the death penalty on juveniles for aggravated first degree murder is disproportionate. Since 1981, eight people under the age of 18 have been convicted of aggravated first degree murder. In none was the death penalty imposed. Indeed, no juvenile has been executed in our state since 1932. *See* Brown, *The Juvenile Death Penalty in Washington: A State Constitutional Analysis*, 15 U. Puget Sound L. Rev. 361, 384 (1992) (citing V. Streib, *Death Penalty for Juveniles* 207-08 (1987)). It cannot then be said the death penalty is generally imposed on juveniles for aggravated first degree murder. Given this fact, the death penalty fails to pass muster under the proportionality review mandated by RCW 10.95.130.

Besides Furman, seven people under the age of 18 have been convicted of aggravated first degree murder since 1981. The circumstances of their crimes and the sentences they ultimately received are set forth below.

Report of the Trial Judge (Questionnaire No. 50): *State v. Stevenson* (Sean Allen), 55 Wn. App. 725, 780 P.2d 873, *review denied*, 113 Wn.2d 1040 (1989).

Age at date of offense: 16

Sean Allen Stevenson was convicted of aggravated first degree murder for the death of his sister and two counts of first degree murder for the deaths of his stepfather and mother. *Stevenson*, 55 Wn. App. at 727.

One aggravating circumstance was found: the rape of a victim, his sister. Report of the Trial Judge (Stevenson), Clark/Skamania Cy. cause 87-1-00011-5, at 5. The court cited evidence of four statutory mitigating circumstances: (1) age of defendant; (2) no prior history; (3) mentally disturbed; and (4) failure to find aggravated murder as to stepfather and mother. Report of the Trial Judge (Stevenson), at 6. The court also cited evidence of one nonstatutory mitigating circumstance: abuse by his stepfather. Report of the Trial Judge (Stevenson), at 7. The prosecutor originally sought the death penalty but withdrew his request on the basis of a psychiatric evaluation of the defendant. Stevenson was sentenced by the jury to life without parole. Report of the Trial Judge (Stevenson), at 7.

Report of the Trial Judge (Questionnaire No. 61): *State v. McNeil* (Russell Duane), 59 Wn. App. 478, 798 P.2d 817 (1990).

Age at date of offense: 17

Russell Duane McNeil (codefendant of Herbert Rice (No. 70)) pleaded guilty prior to trial to two counts of aggravated first degree murder for the death of Dorothy Nickoloff and (as an accomplice) for the death of Mike Nickoloff. *McNeil*, 59 Wn. App. at 478-79. Both victims were elderly (ages 74 and 82) and were stabbed to death, their bodies badly mutilated. Report of the Trial Judge (McNeil), at 8, 9.

The following aggravating circumstances were found (by admission): concealment of first degree burglary and of the identities of those who committed the crimes; a common scheme or plan with more than one murder victim; and committed in the course of and in furtherance of first degree burglary. Report of the Trial Judge (McNeil), at 5. Two mitigating circumstances were cited: the defendant's age and

lack of significant criminal history. Report of the Trial Judge (McNeil), at 6.

The prosecution gave notice it intended to seek the death penalty. Before trial, the State agreed to withdraw its request for the death penalty in exchange for guilty pleas by McNeil. McNeil was sentenced to two consecutive exceptional life sentences without parole. Report of the Trial Judge (McNeil), at 13; *McNeil*, 59 Wn. App. at 478, 479.

Report of the Trial Judge (Questionnaire No. 67): *State v. Cummings* (Susan), 44 Wn. App. 146, 721 P.2d 545, *review denied*, 106 Wn.2d 1017 (1986).

Age at date of offense: 16

Susan Cummings was convicted of aggravated first degree murder. *Cummings*, 44 Wn. App. at 148. The following aggravating circumstances were found: murder in the course of, in furtherance of or flight from robbery, first degree, and rape, first degree; intent to conceal commission of or identity of persons committing the crime of rape and murder. Report of the Trial Judge (Cummings), Walla Walla Cy. cause 85-1-00044-4, at 5. Another aggravating factor cited was the victim's advanced years. Report of the Trial Judge (Cummings), at 13.

The trial judge reported there was no credible evidence of statutory mitigating circumstances, Report of the Trial Judge (Cummings), at 6, and two nonstatutory mitigating circumstances: the defendant's age; and the fact the defendant did not use the weapon that caused death. Report of the Trial Judge (Cummings), at 7.

The trial judge noted in the posttrial questionnaire that there were at least four other teenagers involved in the killing. No other cofelon, however, received a sentence of life without release. Despite this acknowledged disproportionality of the sentence, the trial judge had no alternative but to impose a sentence of life imprisonment without release. Report of the Trial Judge (Cummings), at 7, 13.

Report of the Trial Judge (Questionnaire No. 70): *State v. Rice, Jr.* (Herbert A.), 120 Wn.2d 549, 844 P.2d 416 (1993).

Age at date of offense: 17

Herbert A. Rice (codefendant of Russell McNeil (No. 61) and not to be confused with David Rice (No. 43)) was convicted of two counts of aggravated first degree murder for the death of Mike Nickoloff and (as an accomplice) for the death of Dorothy Nickoloff. *Rice*, 120 Wn.2d at 553. The trial judge found both victims suffered torture and were aware of the other's suffering; both were brutally murdered with dozens of stab wounds; it took many minutes for each victim to die; and both victims were elderly. Report of Trial Judge (Rice), Yakima Cy. cause 88-1-00427-2, at 8.

At trial, the following aggravating circumstances were found: murder committed to conceal the identity of persons committing crimes; multiplicity of victims; common scheme or plan; committed in the course of first degree burglary and robbery. Report of the Trial Judge (Rice), at 5.

Although the defendant claimed a long list of mitigating circumstances including his youth, limited criminal history and extreme emotional disturbance, the trial judge reported that in the court's opinion there was no credible evidence of statutory mitigating circumstances. Report of the Trial Judge (Rice), at 6-7.

The prosecutor sought the death penalty, but the jury was unable to reach a unanimous verdict as to its imposition (11 for death, 1 for life in prison). Rice was sentenced to two consecutive sentences of life without the possibility of release or parole. The trial judge commented in the questionnaire that he thought the life sentence given was inappropriate. *Rice*, 120 Wn.2d at 555; Report of the Trial Judge (Rice), at 7, 13.

Report of the Trial Judge (Questionnaire No. 110): *State v. Harris* (Michael E.), unpublished opinion noted at 58 Wn. App. 1065 (1990).

Age at date of offense: 15

Michael E. Harris (cofelon of Barry C. Massey (No. 111)) was convicted of aggravated first degree murder.

At trial, one aggravating circumstance was found: murder committed during a robbery. Report of the Trial Judge (Har-

ris), Pierce Cy. cause 87-1-01354-7, at 5. The trial judge made no notation in the posttrial questionnaire regarding mitigating circumstances. The prosecutor did not seek the death penalty. Harris was sentenced to life in prison without the possibility of release or parole.

Report of the Trial Judge (Questionnaire No. 111): *State v. Massey* (Barry C.), 60 Wn. App. 131, 803 P.2d 340 (1990), *cert. denied*, 499 U.S. 960 (1991).

Age at date of offense: 13

Barry C. Massey (cofelon of Michael E. Harris (No. 110)) was convicted of aggravated first degree murder for the death of Paul Wang. *Massey*, 60 Wn. App. at 134.

At trial, two aggravating circumstances were found: the murder was committed during a robbery; and was committed to conceal commission of a crime and its perpetrator. Report of the Trial Judge (Massey), Pierce Cy. cause 87-1-01354-7, at 5. The trial judge made no notation in the posttrial questionnaire about mitigating circumstances. The prosecutor did not seek the death penalty. Massey was sentenced to life in prison without the possibility of release or parole.

Report of the Trial Judge (Questionnaire No. 122): *State v. Hofstetter* (Ansel Wolfgang) Court of Appeals cause 15786-1-II; 15471-4-II (disposition pending).

Age at date of offense: 16

Ansel Wolfgang Hofstetter was convicted of aggravated first degree murder. At trial, one aggravating circumstance was found: murder committed in the course of, in furtherance of, or in immediate flight from, robbery in the first or second degree. Report of the Trial Judge (Hofstetter), at 5. The trial judge made no notation in the posttrial questionnaire about mitigating circumstances. The prosecutor did not seek the death penalty. Hofstetter was sentenced to life in prison without the possibility of release or parole.

As the foregoing indicates, the death penalty is not generally imposed on juveniles for aggravated first degree murder. Further, the death penalty is not generally imposed for aggra-

vated first degree murder accompanied by rape when the defendant is an *adult* at the time of the crime. *See State v. Lord*, 117 Wn.2d 829, 942-46, 822 P.2d 177 (1991) (Utter, J., dissenting). Thus, even if there were express legislative authorization to execute persons who were juveniles at the time of the crime, such punishment would be disproportionate, and would fail to pass scrutiny under RCW 10.95.130.

## III
### PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

I write also to point out that the prosecutor's closing argument at the penalty phase was so improper it would be grounds for reversal even if we were otherwise upholding the sentence of death.

Where improper argument is charged, the defense generally bears the burden of establishing the impropriety as well as the prejudice flowing from it. *See State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991). Both are patent on the record before us. Moreover the defendant objected on at least one occasion, see Report of Proceedings (Penalty Phase) vol. 22, at 3548, and requested a limiting instruction, which the court denied. See Report of Proceedings (Penalty Phase) vol. 22, at 3523-28.

Even if there had been no objection, a prosecutor's conduct is reviewable if it is so flagrant and ill intentioned that no curative instruction could have eliminated the prejudice it engendered. *Hoffman*, 116 Wn.2d at 93; *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). This is such a case.

We have held closing arguments compelled mistrial notwithstanding defense counsel's failure to object on facts far less egregious than those present here. In *State v. Reeder*, 46 Wn.2d 888, 893-94, 285 P.2d 884 (1955), this court held that in a prosecution for homicide, it was prejudicial misconduct requiring mistrial for the deputy prosecutor to state three times that the defendant had threatened his first wife with a gun, where there had been no testimony to that effect, and the statements were based on allegations in a divorce com-

plaint not admitted into evidence. The statement we considered prejudicial misconduct also included the following:

"He [the defendant], himself, was married before and divorced by a wife who says he threatened her with a gun in '36. The little man with a gun then, the little man with a gun on September 26, 1953. The little man with a gun out at the resort when the big fellow got in a ruckus with him. There hasn't been any change in this man. He was the same yesterday, today, and he will be tomorrow."

*State v. Reeder*, 46 Wn.2d at 891. Likewise, in *State v. Case*, 49 Wn.2d 66, 73-74, 298 P.2d 500 (1956), a prosecution for carnal knowledge, this court held the deputy prosecuting attorney's closing argument compelled a mistrial, even absent a defense objection, because no instruction could have cured the prejudice created. In *Case* the deputy prosecutor suggested he believed personally in the defendant's guilt, referred to the defendant's character witnesses as "his entire herd", *Case*, 49 Wn.2d at 73, and stated further:

"Is it uncommon for a person charged with a sex crime to be a pillar of society? You can't characterise [*sic*] or pigeonhole this sort of crime in any segment of society. You can have the top man, the top man of the nation, even. It hasn't happened, I am sure, but it could be. We have had men in the State Department that have been accused of things of that nature. In my own experience it has occurred in the Seattle School District, principals of schools have been accused, charged and convicted of sex deviations. It knows no difference. It is like a disease. It is like polio, it hits all over, it doesn't pay any attention to who the person is, whether you had measles as a child, whether you had rickets or something. It is something in the brain and mind and goes all over the area."

*Case*, 49 Wn.2d at 69.

More recently, in *State v. Belgarde, supra*, we reversed the defendants' conviction because the prosecutor made prejudicial comments to the jury about the defendants' alleged ties to the American Indian Movement (AIM), a group he characterized as a "deadly group of madmen" and "butchers". *Belgarde*, 110 Wn.2d at 506-08. We reasoned:

These inflammatory comments were a deliberate appeal to the jury's passion and prejudice and encouraged it to render a verdict based on Belgarde's associations with AIM rather than

properly admitted evidence. The remarks were flagrant, highly prejudicial and introduced "facts" not in evidence.

*Belgarde*, 110 Wn.2d at 507-08.

We reaffirmed our reasoning in *Case* that " '[i]f misconduct is so flagrant that no instruction can cure it, there is, in effect, a mistrial and a new trial is the only and the mandatory remedy' ". *Belgarde*, 110 Wn.2d at 508 (quoting *State v. Case, supra* at 74). If that was true in *Belgarde, Reeder* and *Case*, it is certainly true here, where the substance of the remarks was far more prejudicial, and far less likely to be cured by an instruction. At least three times during closing argument, the prosecutor referred to Furman raping his little brother, an alleged act for which he was never convicted. He also used closing argument to make reference to Furman's other alleged acts of sexual misconduct, including bestiality, also an act for which he was never convicted. Report of Proceedings (Penalty Phase) vol. 22, at 3535, 3541, 3579.

> Or the time that *he raped one of his brothers*, I don't know if it was Mark Paul or the stepbrother here in Port Orchard. He admitted that to his doctor.

(Italics mine.) Report of Proceedings (Penalty Phase) vol. 22, at 3535. And again,

> Think about all the evidence that's been presented in this case, in the first phase and this phase. The defendant would have you believe that his drug activity was part of the root of this problem. And yet when he's in juvenile detention in California, not exposed to any drugs, what's he do. *He exposes himself. Well, he doesn't have drugs as an excuse there. What excuse does he have when he's having sex with the dog? What excuse does he have when he's raping his little brother, or his sister? Or fantasizing about his grandma, having sex with her?*

(Italics mine.) Report of Proceedings (Penalty Phase) vol. 22, at 3540-41. In rebuttal closing argument he stated:

> *How he treats his brother, rapes him anally.* How he treats other people, burgles [*sic*] their houses, steals, smokes dope, drops out of school. That's what we have here. We have a sitting crimewave right there.

(Italics mine.) Report of Proceedings (Penalty Phase) vol. 22, at 3579.

References to Furman's alleged acts of sexual deviancy are far more damaging than the remarks we held fatally prejudicial in the cases discussed above. They were repugnant in the extreme, and at best would have distracted the jury from its statutory mandate to focus on the crime and its circumstances to decide whether there were sufficient mitigating circumstances to warrant leniency. *See* RCW 10.95-.060(4).

The State contends the trial court had already admitted this evidence at the guilt phase, so these references could not have been prejudicial because the jury heard them earlier. The State also maintains the statements had some rebuttal value. Even assuming arguendo the State is correct, the prosecutor's closing argument would still be improper and grounds for reversal.

None of the alleged sexual acts resulted in convictions. We held in *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) that evidence of nonstatutory aggravating factors must be limited to the defendant's record of convictions, evidence that would have been properly admissible at the guilt phase, and evidence designed to rebut the defendant's mitigating evidence. *See Bartholomew*, 101 Wn.2d at 642-43 (quoting *State v. Bartholomew*, 98 Wn.2d 173, 197-98, 654 P.2d 1170 (1982), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983)). We specifically warned against misconstruing our holding to sanction the introduction of highly prejudicial matters of tangential relevance: "We do not intend . . . that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental." *Bartholomew*, 101 Wn.2d at 643 (quoting *Bartholomew*, 98 Wn.2d at 197-98).

We should be especially careful to apply the principles articulated in our case law in the context of a death penalty proceeding, where the defendant faces the harshest penalty available under our sentencing system. The prosecutor's behavior is the more reprehensible because we have repeatedly admonished the State about precisely this type of excess,

even outside the context of a death penalty proceeding. *See, e.g., State v. Belgarde*, 110 Wn.2d 504, 507-09, 755 P.2d 174 (1988); *State v. Reed*, 102 Wn.2d 140, 145-48, 684 P.2d 699 (1984); *State v. Case*, 49 Wn.2d 66, 74-75, 298 P.2d 500 (1956) and cases cited therein.

SMITH, J., concurs with UTTER, J.