IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71013-3-I | |
| | ) | | |
| Respondent, | ) | | |
| | ) | | |
| v. | ) | UNPUBLISHED OPINION | |
| | ) | | |
| AMOS K. GYAU, | ) | | |
| | ) | | |
| Appellant. | ) | FILED: July 20, 2015 | |

SCHINDLER, J. — The State charged Amos K. Gyau in juvenile court with rape in the second degree. Following a bench trial, the court found Gyau guilty of rape as charged. Gyau seeks reversal arguing the court erred in failing to find the State proved lack of consent "beyond a reasonable doubt" and finding the victim's "suicide attempt and psychological problems" as a result of the rape corroborated her testimony. Gyau also argues the court abused its discretion in transferring the charges filed in juvenile court for prosecution as an adult. We conclude the record establishes the State proved lack of consent and forcible compulsion beyond a reasonable doubt, and the court did not err in considering evidence of trauma to the victim as a result of the rape or in declining jurisdiction. We affirm.

FACTS

The court entered extensive findings of fact. Gyau challenges only one of the findings. The other unchallenged findings of fact are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

On September 10, 2011, 19-year-old Y.P. arrived in the United States from Hong Kong on a student visa to attend Edmonds Community College (ECC). Y.P. had never been to the United States before and her English was "not very good."

On September 21, Y.P. encountered 17-year-old Amos K. Gyau at the ECC gym. Gyau was enrolled in a GED[1] program at ECC.

On September 23, Y.P. ran into Gyau again at the ECC gym. Y.P. mentioned she needed to buy a history book and a "driving book." Gyau told Y.P. he could loan her the books she needed. Gyau took Y.P. to his cousin Maxwell Anyimah-Mensah's house "under the pretense of loaning her [the books]." Anyimah-Mensah and his girlfriend were at home when Gyau and Y.P. arrived. Gyau and his cousin went into another room to talk while Y.P. sat on a couch and did homework.

After Anyimah-Mensah and his girlfriend left, Gyau called out to Y.P. to come upstairs so he could give her the books. When Y.P. got upstairs, she saw Gyau standing in the doorway of his cousin's bedroom wearing a grey terry cloth bathrobe. Y.P. tried to go back downstairs but Gyau grabbed her left arm and pushed her inside the room and onto the bed.

When Y.P. yelled for help, Gyau increased the volume on the television in the room. Gyau held Y.P.'s wrists over her head with one hand and used his other hand to pull up her skirt. Y.P. "struggled to get away" but Gyau was "significantly larger and

_____

[1] General education development.

2

stronger than Y.P." Y.P. weighed approximately 100 pounds and was less than five feet tall. Gyau was "a weight lifter and a body builder" and was approximately five foot nine inches tall with a "muscular build."

Gyau told Y.P. to "keep quiet" and struck her with his free hand. Gyau moved Y.P.'s underwear to one side and put his penis in her vagina. Y.P. was breathing "very, very fast" and "decided to fake an asthma attack." Gyau eventually stopped and got Y.P. some water from a nearby table. When Y.P. took a couple of steps toward the door, Gyau grabbed her arm, pushed her back onto the bed, and continued to rape her. When Y.P. tried to yell, Gyau covered her mouth with his hand "very hard."

Y.P. began to have trouble breathing and could not move her arms or legs. Y.P. was able to push Gyau's hand away from her mouth "a little bit." Y.P. told him she was having chest pains. Y.P. then pretended to be unconscious. Gyau tried to revive her by "pounding" on her chest. Y.P. told Gyau she needed her medication and pretended to pass out again. Gyau carried Y.P. downstairs and put her on the couch. Y.P. asked Gyau to call 911 and promised not to "tell people what [he] did to [her]." After Y.P. pretended to pass out again, Gyau called 911 and said that "his girlfriend was having an asthma attack."

Emergency medical personnel arrived approximately two minutes later. When paramedics entered the home, Y.P. was laying "face down, on the ground in between the couches and living room." Y.P. was "hyperventilating and crying." Y.P. was experiencing "carpopedal spasms," causing cramping of the hands and feet and the muscles in her body to go numb. While the paramedics were examining Y.P., she stopped breathing and lost consciousness. Once Y.P. was in the ambulance, she told

3

the paramedics that "she had gone over to the house to get a book for school and that [Gyau] had forced her to have sex with him when she did not want to."

Gyau told the paramedics that Y.P. was his girlfriend and that they had been dating for several weeks. Gyau denied having sex with Y.P. The paramedics contacted the police.

At the hospital, Y.P. agreed to a sexual assault examination and spoke with Lynnwood Police Department Detective Josh Kelsey. Y.P. was "very emotional" but was eventually able to tell the detective that Gyau "promised to loan" her a book, and when he called her upstairs to give her the book, he "threw her on the bed and raped her." Y.P. provided a detailed description of the bedroom, including the fact that there were five mirrors in the room and that there were two beds, "but she thought one was a couch or sofa bed."

Detective Jacqueline Arnett and Detective Rodney Cohnheim interviewed Gyau and took a sample of his DNA.[2]

On November 1, Y.P. tried to kill herself. While in the hospital, Y.P. talked about other assaults. In early December, Detective Arnett interviewed Y.P. about the other assaults. Y.P. described being repeatedly followed and attacked by an unknown male while she was walking home from the bus in mid-October. Detective Arnett did not conduct any additional investigation regarding these alleged assaults because Y.P. "seemed really confused and vague and couldn't give . . . any description on any level."

The State charged Gyau in juvenile court with rape in the second degree. The State filed a motion for a mandatory decline hearing to determine whether to transfer jurisdiction of the charge against Gyau to adult court.

---

[2] Deoxyribonucleic acid.

On January 18, 2012, the juvenile court held a decline hearing. The State submitted the certification of probable cause, Lynnwood Police Department incident reports, a "Decline of Jurisdiction Report" prepared by juvenile court probation counselor Aiko Barkdoll, and a "Forensic Psychological Evaluation" prepared at Gyau's request by licensed psychologist Dr. Brent Oneal.

Barkdoll recommended transferring to adult court. In the psychological evaluation, Dr. Oneal described Gyau's experience growing up in Ghana and moving to the United States in 2009. While attending high school in the United States, Gyau was suspended multiple times for fighting, bringing alcohol to school, and sexually harassing a female student. In April 2011, Gyau was expelled for sexually harassing a female student and threatening a school administrator. Gyau's juvenile justice history indicates he successfully completed a diversion for theft in the third degree in 2010 and a diversion for assault in the fourth degree in 2009 for being "physically aggressive toward a similar-age female student." Gyau also had a pending harassment charge related to the 2011 threats against the school administrator. Dr. Oneal concluded Gyau was "more sophisticated and mature than peer-aged youth" and while there were services available through the juvenile system for Gyau, he "is at a high risk for future violence and the likelihood that [he] would utilize said systems adequately is unclear."

The court entered extensive written findings of fact and conclusions of law and transferred jurisdiction of the charge against Gyau to adult court. After several continuances, trial was scheduled to begin on August 12, 2013. Before jury selection, Gyau waived his right to a jury trial.

5

The State called a number of witnesses to testify during the six-day trial, including Y.P., Gyau's cousin Anyimah-Mensah, the paramedics who treated Y.P., forensic nurse Lori Moore, Detective Kelsey, Detective Arnett, Detective Conheim, ECC counselor Sheryl Copeland, psychiatrist Dr. Christopher Wilson, and a forensic scientist from the Washington State Patrol Crime Laboratory. The forensic scientist testified that the DNA obtained from Y.P. during her sexual assault examination matched Gyau's DNA. Although Y.P.'s English "had improved greatly by trial," a Cantonese interpreter was present to assist if needed.

Y.P. testified that after the rape, she "tried to talk to the counselor" and "tried to find some help, but it wasn't working out" and she was "crying a lot, even in class, I cannot control it." Y.P. testified that when she closed her eyes, she "couldn't sleep" and had dreams that Gyau was "here and touching me, and I kept saying no but he don't stop, he didn't stop and he keep doing it." Y.P. said her doctor told her she had post-traumatic stress disorder (PTSD). Y.P. testified she did not remember the second interview with Detective Arnett in December 2011. Y.P. said she had "a lot of bad dreams" after the assault and thought she might have been attacked again when she was walking home from the Aurora Village Transit Center in October 2011, but she was not sure whether it really happened or whether it was a dream. Y.P. testified that she was sure Gyau raped her and that she knew it was not a dream.

Forensic nurse examiner Lori Moore testified that she examined Y.P. at the hospital on September 23, 2011. Moore testified Y.P. told her that Gyau raped her and that she pretended to have a medical condition to get him to stop. Moore testified Y.P. had bruising on both of her wrists and upper arms, multiple superficial lacerations on

her arms, and an area of "scattered petechiae" on her neck caused by "holding down, squeezing."

Sheryl Copeland, director of the counseling center at ECC, testified she met with Y.P. a few days after the assault. Copeland testified that Y.P. was "not eating, she was not sleeping. She looked disheveled. I could tell she had not showered. She would walk around in just a really big heavy coat, sort of covered up." Copeland testified Y.P. reported being afraid to ride the bus "and just being scared of men in general, afraid it was going to happen again."

Psychiatrist Dr. Christopher Wilson examined Y.P. in the hospital following her suicide attempt. Dr. Wilson testified that Y.P.'s symptoms "appeared consistent with an acute posttraumatic stress reaction. She was having intrusive flashbacks or intrusive memories that were very overwhelming to her." Dr. Wilson testified that he could not "say for sure" what triggered an individual's posttraumatic stress disorder without knowing the patient's clinical history.

Detective Arnett testified that during the interview with Gyau, he stated he met Y.P. three weeks ago and they had been dating for two weeks. Gyau said that he and Y.P. communicated by text messaging and talking on the phone. Detective Arnett obtained a search warrant for Gyau's cell phone and determined that Y.P.'s cell phone number was not in Gyau's text messaging history or call history.

Detective Arnett testified that Gyau initially said the only sexual contact they had was when they were kissing on the couch at his cousin's house and he put his finger inside Y.P.'s vagina. But later, Gyau "completely changed his story" and said they had sex in a bathroom at the Lynnwood Public Library earlier that day. Gyau also initially

said that Y.P. had never been upstairs in his cousin's home, but when asked how Y.P. was able to describe his cousin's bedroom in so much detail, Gyau said Y.P. had gone upstairs and had looked inside the bedroom but did not go in. Detective Arnett testified that when asked if he and Y.P. had had sex before that day, Gyau said he and Y.P. had sex the previous Saturday, September 17, at his friend Antonio Bell's house. Gyau said he contacted Bell over Facebook and Bell said it was okay for him to "bring a girl over."

Antonio Bell and his mother testified that Gyau was not at their home on September 17, 2011. Bell testified that he did not have a Facebook account in September 2011 and that Gyau never contacted him to ask if he could "bring a girl over." Gyau's girlfriend testified that Gyau was with her on September 17 for most of the day.

Gyau testified he met Y.P. several times before September 23. Gyau testified that when he saw Y.P. at the ECC gym on September 23, they "exchanged numbers" and decided to "hang out." Gyau denied offering to loan Y.P. any books. Gyau said he and Y.P. went to the Lynnwood Public Library because he had to return a CD.[3] Gyau testified he and Y.P. went into a stall in the men's bathroom at the library and had consensual sex. Gyau testified that while they were having sex, his "belt buckle scratch[ed] her in between her thighs." Gyau said he "asked her if she was all right and she said yeah." Gyau testified that he ejaculated inside of Y.P.

Gyau said he and Y.P. then walked from the library to his cousin's house. Gyau testified that once his cousin and his cousin's girlfriend left, he and Y.P. sat on the couch downstairs and "started kissing, messing around with each other, and her hands in my pants and mine was in hers, touching each other." Gyau testified that at some

---

[3] Compact disc.

point, he went upstairs to his cousin's bedroom to put on a movie for them to watch, and Y.P. followed him upstairs and tried to come into the bedroom. Gyau said he was embarrassed by how messy the room looked and did not want Y.P. to "think that I'm some kind of dirty dude or something like that," so he grabbed her by the waist and tried to push her out of the room. Gyau testified that Y.P. was "fighting back to get into the room." Gyau said he remembered Y.P. was wearing a bracelet on her wrist and when he held her wrist, "she said ouch." Gyau testified they went back downstairs and started kissing again, and then Y.P. "started acting weird." Gyau testified that at first, he thought Y.P. was "playing games," but then he heard her say "asthma" and that she needed help so he called 911.

On cross-examination, Gyau admitted he lied when he said Y.P. was his girlfriend and he lied when he initially denied having sex with Y.P. Gyau said he did not want to tell the police about having sex with Y.P. in the library bathroom because he was "not trying to disgrace the girl." Gyau testified it was possible he caused the bruising on Y.P.'s arms and wrists when he grabbed her to prevent her from entering his cousin's bedroom, stating that "the way I grabbed [Y.P.], it was like those marks, . . . they could have made those." Despite the testimony at trial, Gyau continued to claim that he and Y.P. had sex at Bell's house on September 17.

The court found Gyau guilty of rape in the second degree because he had sexual intercourse with Y.P. "against her will, by forcible compulsion." The court entered extensive written findings of fact and conclusions of law. The court found the testimony of Y.P. credible, "as much of her testimony is corroborated by the physical evidence as well as the testimony of the other witnesses." The court found Gyau's testimony was

9

not credible and "often inconsistent with previous statements he made and even with testimony he offered at previous times during trial." The court imposed a standard range sentence.

## ANALYSIS

### Forcible Compulsion

Gyau claims he is entitled to reversal because the trial court did not find the State proved lack of consent beyond a reasonable doubt.

Due process requires that the State prove every essential element of the crime charged beyond a reasonable doubt. WASH. CONST. art. 1, § 3; In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Oster, 147 Wn.2d 141, 146, 52 P.3d 26 (2002). "[W]hen a defense necessarily negates an element of the crime, it violates due process to place the burden of proof on the defendant." State v. W.R., 181 Wn.2d 757, 765, 336 P.3d 1134 (2014).

Under RCW 9A.44.050(1)(a), a person is guilty of rape in the second degree "when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion." RCW 9A.44.010(6) defines "forcible compulsion" as follows:

> [P]hysical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped.

In W.R., the Washington State Supreme Court overruled State v. Camara, 113 Wn.2d 631, 781 P.2d 483 (1989), and State v. Gregory, 158 Wn.2d 759, 147 P.3d 1201 (2006), and held that because consent "necessarily negates forcible compulsion," the

State's burden to prove forcible compulsion beyond a reasonable doubt encompasses the defense of consent. W.R., 181 Wn.2d at 768-69.

Here, the record establishes that the court found the State proved forcible compulsion and lack of consent beyond a reasonable doubt. The trial court expressly found the State proved lack of consent and forcible compulsion. The unchallenged findings are verities on appeal. O'Neill, 148 Wn.2d at 571. The unchallenged findings of fact and conclusions of law state, in pertinent part:

20. The defendant pulled Y.P. to the bed, and put her on the bed, against her will, and while she struggled physically and verbally objected.
21. The defendant used force to pin Y.P. to the bed with his body and held her wrists with one of his hands while he kissed her and rubbed her with his other hand.
22. The defendant then moved Y.P.'s underwear to one side, inserted his penis into her vagina, and proceeded to have sexual intercourse with Y.P. while she continued to object verbally and try to squirm away from him.

. . . .

29. On at least one occasion during the rape, the defendant struck Y.P. in an attempt to get her to stop resisting or yelling.
30. Y.P. attempted to stop the defendant from having sexual intercourse with her by physically resisting, verbally telling him to stop and that she did not want to do this, and by yelling for help. The defendant used physical force to overcome both Y.P.'s physical and verbal resistance to the sexual intercourse.

. . . .

48. The Court finds the testimony of Y.P. is credible as much of her testimony is corroborated by the physical evidence as well as the testimony of the other witnesses.
49. The medical findings and the observations of the medical personnel who responded to [Anyimah-Mensah]'s residence corroborate a non-consensual and physically violent rape and not consensual intercourse.

. . . .

51. The defendant's testimony was often inconsistent with previous statements he made and even with testimony he offered at previous times during trial. His statements and testimony were also contradicted in many ways by evidence and other witnesses.
52. The Court finds that the statements and testimony of the defendant are not credible.

. . . .

> 54. On September 23, 2011 the defendant physically forced Y.P. . . . to have sexual intercourse with him, against her will, by forcible compulsion, in the State of Washington, City of Lynnwood.

While the written findings do not specifically state the standard of proof, the oral ruling makes clear the court found the State proved forcible compulsion beyond a reasonable doubt. See State v. B.J.S., 140 Wn. App. 91, 99, 169 P.3d 34 (2007), (noting that a reviewing court may consider the trial court's oral ruling to interpret the written findings and conclusions); State v. Bynum, 76 Wn. App. 262, 266, 884 P.2d 10 (1994).

In its oral ruling, the trial court states that the State bore the burden of proving all of the elements of rape in the second degree "beyond a reasonable doubt." The court notes that it is "essentially conceded and . . . proven beyond a reasonable doubt" that Gyau had sexual intercourse with Y.P. and that the "main issue" in the case was "whether this took place by an act of forcible compulsion." After discussing the evidence presented during trial, the court concluded that the State proved "beyond a reasonable doubt" that Gyau was guilty of rape in the second degree.

> Looking at everything, it is clear to me that the testimony of [Y.P.] is credible, and I find that beyond a reasonable doubt. And I find beyond a reasonable doubt that the testimony of Amos Gyau is not credible and is not corroborated. Therefore, I find forcible compulsion was used. I do find that [Y.P.] was raped. And I find beyond a reasonable doubt that Amos Gyau raped her and that the conviction will stand of rape in the second degree.

Evidence of Emotional Trauma

Gyau also claims the court erred in finding that Y.P.'s "suicide attempt and psychological problems" corroborate her claim of "traumatic rape," and that Y.P.

"appeared to suffer from post traumatic stress disorder as a result of being raped by the defendant."[4]

In State v. Black, 109 Wn.2d 336, 348-49, 745 P.2d 12 (1987), the court held expert testimony that an alleged victim is suffering from "rape trauma syndrome" is not admissible, but "evidence of emotional or psychological trauma suffered by a complainant after an alleged rape" is admissible and the trier of fact "is free to evaluate it as it would any other evidence." Here, the record shows the court considered evidence of only emotional and psychological trauma that Y.P. suffered after the rape, and substantial evidence supports the challenged finding.

Y.P. described being unable to control her emotions after the attack and having vivid nightmares about Gyau hurting her. Copeland testified that after the rape, Y.P. was not eating or sleeping and was afraid that Gyau would attack her again. Dr. Wilson testified that Y.P.'s symptoms were "consistent with" PTSD. The court drew reasonable inferences from the evidence. "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Decline of Juvenile Jurisdiction

Gyau argues the juvenile court erred in analyzing two of the eight factors set forth in Kent v. United States, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966),

---

[4] The challenged finding of fact states, in pertinent part:

50.   The court finds that Y.P.'s subsequent suicide attempt and psychological problems corroborate Y.P.'s claim of a traumatic rape and do not negatively impact her credibility. Y.P. appeared to suffer from post traumatic stress disorder as a result of being raped by the defendant.

Gyau assigns error to finding of fact 49 and finding of fact 50 but makes argument as to only finding of fact 50.

in ordering the decline of juvenile jurisdiction. The State argues the issue is moot because Gyau was 19 years old at the time of trial. We agree with the State.

The juvenile court's jurisdiction ends once the juvenile turns 18 years old. RCW 13.04.030. "Even if a juvenile cause were pending and not yet heard on the merits prior to the juvenile's 18th birthday, the juvenile court loses jurisdiction." State v. Bushnell, 38 Wn. App. 809, 811, 690 P.2d 601 (1984); see also State v. Brewster, 75 Wn.2d 137, 141-42, 449 P.2d 685 (1969) (faulty transfer from juvenile to adult court had no impact because adult court had clear jurisdiction at time of trial due to defendant being over 18 years old).

In any event, we conclude the juvenile court did not abuse its discretion in declining jurisdiction. Under RCW 13.40.110, the juvenile court has the discretion to transfer jurisdiction to adult court if it finds that "declination would be in the best interest of the juvenile or the public." RCW 13.40.110(3). In determining whether to transfer or retain jurisdiction, the court must consider the eight factors originally set forth in Kent, 383 U.S. at 566-67.[5] State v. Furman, 122 Wn.2d 440, 447, 858 P.2d 1092 (1993). All eight of the Kent factors need not be proven, but the record must demonstrate that each of the factors were considered. Furman, 122 Wn.2d at 447.

A decision to decline jurisdiction is discretionary and subject to reversal only if exercised on clearly untenable or manifestly unreasonable grounds. Furman, 122

_____

[5] The eight Kent factors are:
(1) the seriousness of the alleged offense and whether the protection of the community requires declination; (2) whether the offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against persons or only property; (4) the prosecutive merit of the complaint; (5) the desirability of trial and disposition of the entire case in one court, where the defendant's alleged accomplices are adults; (6) the sophistication and maturity of the juvenile; (7) the juvenile's criminal history; and (8) the prospects for adequate protection of the public and rehabilitation of the juvenile through services available in the juvenile system.
Furman, 122 Wn.2d at 447.

14

Wn.2d at 447. We will not disturb the juvenile court's findings if they are supported by substantial evidence. State v. M.A., 106 Wn. App. 493, 498, 23 P.3d 508 (2001).

Gyau does not challenge the juvenile court's findings as to the five factors the court found favored decline or were neutral.[6] Gyau contends substantial evidence does not support the court's finding on the sixth Kent factor, the sophistication and maturity of the juvenile.[7] Substantial evidence supports the juvenile court's finding that Gyau was more sophisticated and mature that other juveniles his age. Gyau's juvenile probation counselor Barkdoll noted Gyau had "a significant amount of independence" and the "ability to manage his own time with little oversight." Dr. Oneal concluded Gyau "currently possesses a high level of sophistication and maturity."

Gyau also contends the court erred in analyzing the eighth Kent factor, the prospect for adequate protection of the public and rehabilitation of the juvenile through

---

[6] The court found the seriousness of the offense and protection of the community, the aggressive and violent nature of the act, the fact that the offense was against a person, and the merit of the complaint all weighed in favor of declining jurisdiction. The court found that the fifth Kent factor was neutral because there were no codefendants in the case. The court found that the seventh Kent factor, the juvenile's criminal history, weighed in favor of retaining juvenile jurisdiction because while Gyau had "some history" that is "somewhat concerning," it "has not yet resulted in conviction."

[7] In addressing the sixth Kent factor, the court found:

The sixth Kent factor is the Respondent's sophistication and maturity. The respondent was 17 ½ years old when this offense occurred. He is now almost 18 years old. Based on the evidence presented, including Dr. O'Neal's [sic] report, the Probation report submitted by Aiko Barkdoll, and the reports submitted regarding this case, Respondent is more sophisticated and mature than other Juveniles his age. The Respondent possesses a high level of autonomy, has a high level of cognitive capacity, a moderate-to-high level of emotional maturity, and a high level of sophistication and maturity. This factor weighs in favor of the juvenile court declining jurisdiction.

services available in the juvenile system.[8] Gyau asserts the probation officer's report misstates the adult sentencing consequences because the report fails to indicate he could be incarcerated beyond the standard range and erroneously states he could obtain "relief" from registration requirements.[9]

The record does not support Gyau's argument. The probation officer's report correctly states the adult standard range for rape in the second degree is "78 to 102 months (6.5 to 8.5 years) of confinement to a maximum of life." During the decline hearing, the prosecutor stated that Gyau would face an "intermediate sentence" up to life and be on supervision for "the rest of his life." When defense counsel informed the court that he and Gyau had discussed the adult sentencing consequences "plus the reporting requirement and the fact of supervision for a period of time," the juvenile court immediately clarified that it was "[n]ot for a period of time" but would be "the rest of his life." While the probation officer's statement concerning the possibility of relief from

---

[8] In addressing the eighth Kent factor, the court found:

The eighth Kent factor is the prospect of adequate protection of the public and the likelihood of reasonable rehabilitation of the Respondent. The Court finds, based on the evidence presented and the report of Dr. O'Neal [sic] and probation, that the Respondent is a high risk for future violent behavior. The Respondent exhibits a moderate-to-high level of violent and aggressive tendencies, a moderate level of planned and extensive criminality, and a high level of callous-unemotional traits. The Respondent shows a moderate amenability to treatment. If the respondent remained in the juvenile system, the system would have just a little over 3 years to attempt to rehabilitate the respondent. After the respondent turned 21, he would no longer be supervised. On the other hand, the adult system offers the possibility of a lifetime of community supervision upon conviction, as well as a longer period of incarceration during which the respondent could receive treatment if he were amenable. The Court finds that it is not likely that the respondent would be rehabilitated if kept in the juvenile system. In order to adequately protect the public from the respondent, the juvenile court must decline jurisdiction and the respondent should be treated as an adult.

[9] The Decline of Jurisdiction Report states, "In both systems, ultimately a responsible offender may earn the ability of relief of registration by living a responsible life."

registration is erroneous, the record shows that the juvenile court clearly understood the adult sentencing consequences.[10]

We affirm.

WE CONCUR:

---

[10] Gyau also faults the juvenile court for failing to consider the possibility that he could face deportation if convicted as an adult.  But Gyau concedes this issue was not raised until the sentencing hearing, and there is no information in the decline hearing record regarding Gyau's citizenship status.